UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

        - against -
                                   Cr. No. 08-370 (S-4)(JBW)(RER, Jr.)

ERIC BUTLER,

                Defendant.


# SENTENCING MEMORANDUM ON BEHALF OF
# ERIC BUTLER


EMMET, MARVIN & MARTIN, LLP
Paul T. Weinstein
*Attorneys for Defendant Eric Butler*
120 Broadway, 32nd Floor
New York, New York  10271
(212) 238-3000

MOLO LAMKEN LLP
Steven F. Molo
Robert K. Kry
Edward F. Daniels
*Attorneys for Defendant Eric Butler*
350 Park Avenue
New York, NY 10022
(212) 607-8160

1

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................1

I. ERIC BUTLER'S PERSONAL HISTORY .................................................................2

    A.      Childhood And Education..............................................................................2

    B.      Eric's Life Is His Family................................................................................2

    C.      Eric's Lifelong Friends ..................................................................................4

    D.      The Views of Investor Laurence Stone ........................................................6

II. ERIC'S WORK HISTORY, EMPLOYMENT AT CREDIT SUISSE, AND THE
AUCTION RATE SECURITIES MARKET...................................................................8

    A.      Eric's Work History......................................................................................8

    B.      Eric's Employment At Credit Suisse ...........................................................8

    C.      The Auction Rate Securities Market ............................................................9

    D.      Representations And Actions Taken By Merrill Lynch And Deutsche
              Bank To Convince The Market That ARS Were Safe And Liquid
              Investments Prior To The Demise Of The ARS Market................................12

    E.      The Sale Of Auction Rate Securities At Credit Suisse ...........................13

III. THE OFFENSE ........................................................................................................15

IV. A SENTENCE WHICH RECOGNIZES THAT MR. BUTLER NEITHER
INTENDED NOR COULD REASONABLY FORESEE ANY HARM FROM THE
SALE OF AAA-RATED AUCTION RATE SECURITIES IS APPROPRIATE HERE .............19

    A.      Introduction.................................................................................................19

    B.      Advisory Guidelines And This Court's Sentencing Discretion.............................19

    C.      Guidelines Calculation ................................................................................20

          1.      Presentence Report Calculation ................................................20

          2.      Defendant's Calculation............................................................21

    D.      Guidelines Analysis ....................................................................................22

          1.      There Is No Reasonably Foreseeable Or Intended Loss Pursuant
                   To Guideline Section 2B1.1(b)(1) ............................................22

          2.      Mr. Butler's Actions Were Not The Proximate Cause Of Any Loss
                   Here............................................................................................27

          3.      The Government's Alternate "Gain" Calculation.....................30

                  a.      Credit Suisse Commissions..........................................31

                  b.      Morgan Stanley Forgivable Loan .................................33

4.      Enhancements For The Number Of Purported Victims, For Substantial Conduct From "Outside of the United States," And For Role In The Offense Are Inapplicable Here ...............................................34

      a.     A Guidelines Enhancement For 10 Or More Victims Does Not Apply Here.......................................................................... 35

      b.     A Guideline Enhancement For Committing A Crime From A Foreign Country Has No Application Here .............................. 35

      c.     A Role Enhancement Pursuant To Guideline Section 3B1.1 Is Not Appropriate In This Case .......................................... 37

E.      A Non-Guidelines Sentence Is Appropriate Here.................................................38

      1.      The PSR's Loss Calculation Overstates The Seriousness Of The Offense...............................................................................................39

      2.      A Combination Of Additional Bases Support A Non-Guidelines Sentence .............................................................................................41

V. THE FACTORS SET FORTH IN 18 U.S.C. § 3553(a) STRONGLY COUNSEL A LOW SENTENCE, WHICH MAINTAINS MR. BUTLER'S FAMILY RELATIONSHIPS............................................................................................................43

A.      History and Characteristics of Eric Butler .............................................43

B.      Nature and Circumstances of the Offense ..........................................44

C.      The Need to Protect the Public from Further Crimes by the Defendant...............49

D.      The Need to Provide Adequate Deterrence of Others ...........................................50

VI. THE GOVERNMENT'S FORFEITURE CLAIMS ARE INSUFFICIENT .........................51

A.      The Government May Only Seek Forfeiture of Net Profits From Specific Illegal Transactions..............................................................................................51

B.      The Assets Sought By The Government Are Not Subject To Forfeiture Because They Do Not Constitute Or Derive From Net Profits From Specific Illegal Transactions...............................................................................53

VII. RESTITUTION MAY NOT BE AWARDED IN THIS CASE...........................................55

VIII. CONSIDERATION OF A FINE .......................................................................................56

CONCLUSION....................................................................................................................57

## <u>TABLE OF AUTHORITIES</u>

### CASES

*Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336 (2005) ...........................................27, 28, 29

*Gall v. United States*, 552 U.S. 38, 50 (2007) ...................................................................19, 43

*Rita v. United States*, 551 U.S. 338 (2007)........................................................................19, 22

*Spears v. United States,* -- U.S. **--,** 129 S.Ct. 840 (2009) ..............................................19

*United States v. Adelson*, 441 F.Supp.2d 506 (S.D.N.Y. 2006) ........................................47, 50

*United States v. Booker*, 543 U.S. 220 (2005) ......................................................................19, 39

*United States v. Capoccia*, 503 F.3d 103 (2d Cir. 2007) ..........................................................51

*United States v. Chatterji*, 46 F.3d 1336 (4th Cir. 1995)..........................................................34

*United States v. Confredo*, 528 F.3d 143 (2d Cir. 2008) .......................................................24, 25

*United States v. Contents in Account No. 059-644190-69*, 253 F.Supp.2d 789
   (D. Vt. 2003).........................................................................................................................51

*United States v. Crandall*, 525 F.3d 907 (9th Cir. 2008)..........................................................30

*United States v. Diambrosio*, Case No. 04-66, 2008 WL 732031 (E.D. Pa. Mar. 13, 2008) ........49

*United States v. Deutsch*, 987 F.2d 878 (2d Cir. 1993) .............................................................30

*United States v. Donaby*, 349 F.3d 1046 (7th Cir. 2003)...........................................................55

*United States v. Donaghy*, 570 F.Supp.2d 411 (E.D.N.Y. 2008) ...............................................55

*United States v. Eagleton*, Case No. 97-10090, 1997 WL 753423
   (9th Cir. Nov. 28, 1997)..................................................................................................40, 41

*United States v. Ebbers*, 458 F.3d 110 (2d Cir. 2006) ...................................................27, 45, 46

*United States v. Emmenegger*, 329 F.Supp.2d 416 (S.D.N.Y. 2004) ..........................................40

*United States v. Giggey*, 501 F.Supp.2d 237 (D. Me. 2007) ..................................................25, 26

*United States v. Hammond*, 37 F.Supp.2d 204 (E.D.N.Y. 1999) ................................................41

*United States v. Handy*, 570 F.Supp.2d 437 (E.D.N.Y. 2008) ..............................................40, 41

*United States v. Innarelli*, 524 F.3d 286 (1st Cir. 2008)............................................................55

i

*United States v. Jones*, 531 F.3d 163 (2d Cir. 2008) ...................................................19

*United States v. Juwa*, 508 F.3d 694 (2d Cir. 2007) ...................................................32

*United States v. Kalish*, Case No. 06 Cr. 656(RPP), 2009 WL 130215
　(S.D.N.Y. Jan. 13, 2009)........................................................................52, 53

*United States v. Kelley*, Case No. 06-5536-cr, 2009 WL 19083 (2d Cir. Jan. 5, 2009) ...............53

*United States v. Leonard*, 529 F.3d 83 (2d Cir. 2008)...................................................30

*United States v. Lizza Industries*, 775 F.2d 492 (2d Cir. 1985)........................................53

*United States v. Masek*, **--** F.3d **--**, Case No. 08-1296, 2009 WL 4680328
　(10th Cir. Dec. 10, 2009) ..........................................................................55

*United States v. Miller*, 588 F.3d 560 (8th Cir. 2009). ...............................31, 35, 44, 45

*United States v. Morrison*, Case No. 04-CR-699(DRH), 2009 WL 2929463
　(E.D.N.Y. Sept. 10, 2009)........................................................................51, 54

*United States v. Mueffelman*, 400 F.Supp.2d 368 (D. Mass. 2007)................................40

*United States v. Nacchio*, 573 F.3d 1062 (10th Cir. 2009)....................................52, 53

*United States v. Olis*, 429 F.3d 540 (5th Cir. 2005)....................................................27

*United States v. Parris*, 573 F.Supp.2d 744 (E.D.N.Y. 2008)....................................47

*United States v. Rigas*, 583 F.3d 108 (2d Cir. 2009) ...................................................46

*United States v. Robie*, 166 F.3d 444 (2d Cir. 1999) ...................................................31

*United States v. Rutkoske*, 506 F.3d 170 (2d Cir. 2007)...............................................27

*United States v. Santos,* -- U.S. **--,** 128 S.Ct. 2020 (2008) ..........................................53

*United States v. Schneider*, 930 F.2d 555 (7th Cir. 1991) .............................................45

*United States v. Soto-Cruz*, 449 F.3d 258 (1st Cir. 2006) ......................................47, 48

*United States v. Speed Joyeros, S.A.*, 204 F.Supp.2d 412 (E.D.N.Y. 2002)................................42

*United States v. Williams*, 524 F.3d 209 (2d Cir. 2008) ...............................................20

*United States v. Wittig*, 333 F.Supp.2d 1048 (D. Kan. 2004).......................................51

*United States v. Zolp*, 479 F.3d 715 (9th Cir. 2007)....................................................22

# FEDERAL STATUTES

15 U.S.C. §§ 78j ................................................................................................................20

15 U.S.C. §§ 78ff ..............................................................................................................20

18 U.S.C. § 1349 ...............................................................................................................20

28 U.S.C. § 2461 ...............................................................................................................51

18 U.S.C. § 3553 .............................................................................19, 21, 41, 43, 44, 49, 50

18 U.S.C. § 371 .................................................................................................................20

18 U.S.C. § 981 .................................................................................................51, 52, 53, 54

18 U.S.C. § 3663A .............................................................................................................55

U.S.S.G. § 2B1.1 ...........................20, 21, 22, 23, 24, 25, 27, 30, 31, 34, 35, 36, 37, 38, 39, 40, 41

U.S.S.G. § 3B1.1 ..........................................................................................................21, 35

U.S.S.G. § 3D1.2(d) .......................................................................................................20. 22

U.S.S.G. § 3D1.3 ...........................................................................................................20, 22

U.S.S.G. § 2F1.1 ...............................................................................................................24

U.S.S.G. § 5E1.1 ...............................................................................................................55

# MISCELLANEOUS

*Sentencing High-Loss Corporate Insider Frauds after Booker*, 20 Fed. Sent. Rpt. 167,
    171 (Feb. 2008) ...........................................................................................................44

## **INTRODUCTION**

Eric Butler comes before this court for sentencing following his conviction on charges of securities fraud and conspiracy emanating from his sale of auction rate securities.  As noted at trial and explained more fully below, the entire market for these bonds collapsed in 2007, leaving investors with securities that the entire investment community had thought were liquid.  Mr. Butler now faces sentencing for selling sophisticated investors AAA-rated securities, that he, as well as other brokers and investors, thought would only benefit his clients.  To date, this case remains, as far as a recent review of public sources reveals, the only criminal prosecution arising from the unprecedented collapse of the more than $300 billion auction rate securities market.

This Memorandum discusses the factors to be considered in determining a sentence appropriate under the circumstances – including Mr. Butler's impeccable background, his strong family bonds, and his extraordinary support in the community as well as the facts surrounding the offense with which Mr. Butler was charged.

In particular, this Memorandum addresses the uncontroverted evidence and applicable law which establish that any harm suffered by those who purchased auction rate securities from Mr. Butler was in no way foreseeable.  Mr. Butler sold the investors here only auction rate securities that were AAA-rated, and no auction for a AAA-rated security had ever failed since the auctions began almost 20 years before the events in issue.

Full consideration of the extraordinary circumstances call for a sentence far less than that demanded by the government and outside the range set forth in the Sentencing Guidelines.

# I.

## ERIC BUTLER'S PERSONAL HISTORY

### A.     Childhood And Education

Eric Butler was born in Syracuse, New York, on August 30, 1972.  He grew up in a modest Syracuse neighborhood.  He is the second oldest of five children, whose ages span 9 years.  He graduated in 1989 from Westhill High School, where he played soccer and basketball and ran track.  He worked summers at a small grocery store.

He received a soccer scholarship to attend Virginia Commonwealth University, in Richmond, Virginia.  He missed his family, and after two years transferred to Syracuse University, from which he graduated in 1993.

He married his wife, Elizabeth, in 2003.  They have one child, their son Ethan, who is 2 years old.

### B.     Eric's Life Is His Family

Eric has always been close to his family and friends.  His identity is there.  This is revealed in the more than 80 letters of support submitted to this Court.  While concededly these letters come from people with a close personal connection to Eric, their volume and depth provide a compelling picture of his true character.

The letters describe Eric in the warmest terms – as a thoughtful and dedicated father, husband, and son, even during the ordeal of this prosecution.  His mother, Emileen Butler, describes how "[h]is two year old son Ethan is the center of his life," (Exh. 1 at p. 1) and this, and other letters, consistently describe how Mr. Butler's family is the focus of his life.  Emileen Butler explained that Eric was "brought up to value family and learned that family love, devotion, hard work and unity meant everything," and that he lives his life that way.  Id.  She describes the agony that the family has experienced during the past two years, which saw the

2

birth of Eric's son, whom she describes as "the center of his life."  Id.  She fears that the sentence

in this case could destroy Eric's chance to maintain his family.  Id. at p. 2.

Eric's father, Joseph, also describes Eric's love and devotion to his son, calling him an

"outstanding father and husband."  Exh. 2 at p. 1.  Eric's wife Elizabeth describes Eric as an

"amazing father, excellent friend, and loving husband," who is "very humble, not showy,

grounded, and straight forward."  Presentence Report at ¶ 75; see Exh. 3.

Eric's sisters, Carolyn and Elizabeth, echo these sentiments.  Exhs. 4, 5.  Carolyn

describes her brother as:

> an amazing son, husband and most importantly father.  He has always put
> others first and holds these relationships in his heart at all times.  Eric is
> genuine and honest.  He is a hard worker and has always strived to make a
> good life for his family.

Exh. 4 at p. 1.  His sister Elizabeth Butler explains that she was adopted from Korea as a baby,

and that Eric always bragged to others about her.  She calls him "a role model for me my entire

life."  Exh. 5 at p. 1.

Eric's brother, Keith, describes Eric's generosity, telling the story of how while Eric was

working as an assistant manager at the Walmart store, he paid Keith's rent, food, and living

expenses, so that Keith could take a rewarding job in New York that was very low paying.

Exh. 6.  As Keith explains:

> Family is the most important thing in Eric's life. . . . Eric is at his best
> when he is around family.  We had a large family growing up that spent
> pretty much every hour of every day together.  That bond has remained to
> this day, and I can see how he is developing the same bond with his wife
> and two year old son Ethan. . . . To take Eric away from his family would
> be completely devastating.  The last two years preparing for this trial has
> been as close to torture as you can get.  His wife needs a husband to
> depend on.  His son needs a father to rely on.  I need a brother to lean on.

Id.

A sister-in-law, Jessica Butler, describes Eric as "[t]he type of guy that you can call or count on in your greatest time of need.  He's not one to judge or ask questions, he just does whatever he can to help out his family and friends never looking for anything in return . . . he's one of the most generous, family oriented, caring people I've ever met."  Exh. 8 at p. 1.  A brother-in-law, Asher Harley, wrote, "I have never met a father who plays a larger role in his son's life or takes greater enjoyment spending time with his child."  Exh. 9 at p. 1.

The parents of Eric's wife, Elizabeth, both have been deceased for some time. Elizabeth's sister, Claudette Duvall, wrote of how because Elizabeth is 20 years her junior, she "observed [Eric] . . . like a specimen under a microscope," and that "[t]he Eric I know would not knowingly steal, be dishonest, or hurt anyone, business associate, or family, intentionally." Exh. 10 at p. 1.

In all, 23 family members have written on Eric's behalf.  Their letters portray him as a supremely devoted, honest, supportive man, dedicated first to his family.  See Exhs. 1-23.

C.    **Eric's Lifelong Friends**

Eric's friends universally attest to his good character, humility, strong principles and, foremost, his love of family.  Richard Walker, a 25-year friend, wrote of how he "felt passionate about sharing my thoughts with you concerning Eric," describing how:

> they have become "life long" friends mostly because of the type of person
> he is. . . .He has a heart of gold and that heart is larger than life.  I do not
> believe that the circumstances that occurred recently in his professional
> life are indicative of his character.

Exh. 24.

Similarly, Scott Miller, the CFO of a business unit for a large corporation, and who has known Mr. Butler for 30 years, describes him as a person "with impeccable values, judgment and character."  Exh. 25 at p. 1.  He states "[t]he accusations and guilty verdict are completely

4

contrary to the person I have known for my entire life.  Eric has suffered tremendously, both emotionally and financially since the allegations were first raised back in 2007."  <u>Id</u>. at pp. 1-2. Jon Huarta, the Godfather of Ethan, Eric's son, noted that even though Eric was under the stress of this case, his son was always his first priority, that he took him to the park every single day, and that "[n]ot once has Eric allowed what has happened effect Ethan."  <u>Id</u>.  Mr. Huerta, like many others, states that he cannot believe that Eric Butler would intentionally mislead anyone. <u>Id</u>.

The outpouring of support from those who have known Eric through all aspects of his life is extraordinary.   Repeatedly, they refer to his "honesty and sincerity", <u>see</u>, <u>e.g.</u>, letter of Lorraine D'Agostino, Exh. 38, his "sense of fair play," <u>see</u>, <u>e.g.</u>, letter of Carol Dottolo, Exh. 40, and his "good morals, family values, and strong work ethic," <u>see</u>, <u>e.g.</u> letter of Sarah Solomon, Exh. 41.

Longtime friend Robert L. Dana eloquently wrote:

> I have known Eric and his family for over 30 years.  We first met as part of a church group dedicated to the concepts of family, community, and respect – respect for each other and respect for Christian values and the values required by our American culture and norms.  Eric was raised to respect those values and to embrace them as an integral part of his life. His parents and siblings all demonstrated and lived those values, as did Eric and the others involved with that church group.  Eric, his siblings and my children were all part of that church community.  His family did not tolerate disrespect for any of those values, and demanded and received respect for those civil and moral values from Eric.  I never knew Eric to be anything but respectful of those values.

Exh. 42.

James O'Brien, a police detective in the Syracuse Police Department, has known Eric for 15 years.  Exh. 49.  He wrote:

> I guess the best way that I can describe him is to say that he is a genuine good person.  As I said, everyone around here is just shocked because we know what a terrific person Eric is.  I have never heard anyone say a

> negative word about him. . . . The purpose of this letter if [*sic*] so I could
> express how I and a lot of other people feel about Eric. I personally hope
> and pray that Eric is given a second chance to raise and care for his family.
> He is truly a special person that comes from a special family. I appreciate
> your time and thank you in advance for reading this letter.

Id. Likewise, the Stone family submitted a joint letter written by Gary Stone, who has been

actively involved with Eric and his family since Eric was a teenager. He wrote:

> What this young man has been charged with I never would have, in even
> the slightest thought, related to Eric. The entire Butler family has been
> nothing but one which our community and friends are proud to know and
> be part of . . . . We the Stone family hold Eric in the highest esteem. . . .
> Please we ask on behalf of justice that this young man be allowed to stay
> in society and with his young family. He will be an outstanding and
> contributing individual that we will all be proud to know and be part of in
> his future.

Id.

This of course is just a sampling of the many letters submitted by family, Eric's friends,

and members of the community. Uniformly, they show that Eric is a person of good character.

### D.   The Views of Investor Laurence Stone

Finally, Exhibit 85 is a letter from Laurence L. Stone, who is not related to the Stone

family mentioned above. Mr. Stone is an investor, who was a client of Eric Butler's for over 5

years, at Credit Suisse, and at Morgan Stanley. He invested millions of dollars through Eric. His

letter provides great insight into Eric Butler, and the auction rate securities market, before the

auctions failed. Mr. Stone writes "I was a client of Eric's for 5+ years while he was employed at

Credit-Suisse and Morgan Stanley. Eric has always treated my brokerage account with the

utmost of integrity and has always been an honest and upright person." Exh. 85 at p. 1. He

states:

> I can tell you that over the course of 5+ years I had only purchased
> Auction Rate Municipal Securities [i.e., not student loan backed auction
> rate securities] recommended by Eric and all securities were high quality

in nature and accurately presented to me by Eric.  I have only had positive business dealings with Eric Butler.

Id.

Mr. Stone candidly states that the failure of the auction rate securities market, the essence of the prosecution's theory of the cause of harm to investors, had nothing to do with Eric.  Id. Mr. Stone writes:

> Now with that said, I cannot attest to what he sold to other individuals or corporations, but I would tell you that the failure of the Auction Rate Security Market is a failure of not any one individual but clearly a failure by Wall Street investment firms like Credit-Suisse, Morgan Stanley, Goldman Sachs, UBS, Citigroup etc., who never told their clients of a possibility of a failed auction and what that actually meant.  I know this since I had accounts at many of these firms and experienced failed auctions at Credit-Suisse, Morgan Stanley and CitiGroup and the main problem was that of no fault to investment advisers like Eric Butler, the real problem was the actual investment bank who "never" educated investment advisors like Eric Butler that Auction Rate Securities can fail and what the implications on the investor in event of a failed Auction on a security.  I had found out the hard way since I owned a significant amount of Auction Rate Securities which resulted in failed auctions and was stuck in these securities for quite awhile.  Luckily as I understand it, the Attorney General's office of New York arrived at settlements with those investment banks to make investors whole and pay us back on these failed auctions.

Id. at p. 1.

Mr. Stone makes the important point that "[t]he underlying fault of improper investor education started with the top of these investment banking firms and not with the good, hardworking and honest individuals like Eric Butler."  Id. at p. 2.  Mr. Stone stated "that Eric was always 110% honest with myself and handled my investment brokerage account with the utmost of integrity."  Id.  He then summed up his experience with Eric in this way:  "Out of all the investment advisors/brokers I have worked with at many major Wall Street firms, I can truly say Eric was the most honest and stand-up person I have ever dealt with."  Id.

## II.

## ERIC'S WORK HISTORY, EMPLOYMENT AT CREDIT SUISSE, AND THE AUCTION RATE SECURITIES MARKET

**A.**     **Eric's Work History**

After graduating from college, Eric began working in a management training program at Walmart in Rochester, New York.  After six years with Walmart, he sought to better himself by seeking career opportunities at a bank.  In 1998 he was hired in the corporate trust department at a predecessor to JPMorgan Chase.

Seeking to advance his career further, in 2000 Eric obtained a sales assistant job at Oppenheimer, where he worked as an assistant to a broker selling investments to corporate clients.   In 2002, Eric learned that a broker at Lehman Brothers who sold investments to corporate investors needed a sales assistant.  He was hired, and that is where he met Julian Tzolov.  The two worked as sales assistants with the same broker at Lehman Brothers.

After having been a sales assistant for 3 years – two at Oppenheimer, and one at Lehman Brothers – answering telephone calls and entering orders, Eric moved to Credit Suisse with Julian Tzolov to become a broker himself, selling investments to corporate investors.

**B.**     **Eric's Employment At Credit Suisse**

Eric used his experience at Oppenheimer and Lehman Brothers to develop customers of his own.  The products that Mr. Butler sold were those that he knew from his work at Oppenheimer and Lehman Brothers, and included auction rate securities of different types, commercial paper, agency bonds, and money market products.

In the Credit Suisse's organizational structure, Eric was a broker in the Private Wealth Management Division.  He had no other responsibilities.  There was no formal group that he led.

He was just a broker, who worked with another broker.  He had no authority, essentially, other than to sell investment products provided to him by his employer.

It is important to note that as a broker in the Private Wealth Management Division, Eric had no authority to make bank policies.  He played no role in structuring or underwriting securities he sold.  He did not create or make markets for any securities.  He did not organize or administer auctions at which auction rate securities were sold.  Finally, he played no role in rating the securities he sold.

### C.    The Auction Rate Securities Market

The Declaration of Sylvain Raynes, Ph.D., dated January 7, 2010 ("Raynes Dec.") is attached to this Memorandum as Exhibit A.  Dr. Raynes is an expert in the field of the structuring of asset-backed securities, the rating of securities, and auction rate securities.  Raynes Dec. at ¶¶ 10-12.  This Court heard Dr. Raynes testify at a *Daubert* hearing before trial and concluded that he is qualified as an expert to testify on these matters.  See Testimony of Sylvain Raynes ("Raynes Test.") at P. 64-65 (excerpts from the testimony of Sylvain Raynes are attached to this Memorandum as Exhibit B).  In his declaration, Dr. Raynes sets forth the history of the ARS market.  He explains that the market began in approximately 1984, and was intended to be a market in which long term bonds could be held as short term investments, through the mechanism of a regular auction.  Raynes Dec.  at ¶ 35.

Through the auction mechanism, structured securities backed by various classes of assets and generally having long maturities, some up to 40 years, were traded at auctions every few weeks.  Id. at ¶ 40.  The interest rates on the bonds were variable, and set at the auction. Generally, bonds with the highest credit rating, AAA, were offered as auction rate securities, which was seen as guaranteeing that sufficient investors would bid at the auctions to purchase all of the ARS offered for sale.  Id. at ¶ 44.

Mechanically, the day before or morning of an auction for an ARS issue, the issuing bank communicated "price talk" to brokers and investors, which was a prediction of the interest rate that would be set at the auction. Brokers and investors then submitted bids to an auction agent, working with the issuing bank, to buy the ARS at par – a designated interest rate. The yield on the ARS was then set for all bidders at the highest interest rate that permitted the sale of all the ARS offered at the auction. Id. at ¶ 43.

The ARS market existed solely to provide liquidity to long term structured bonds. See id. at ¶¶ 35-36. Every market participant, including investors, brokers, and banks, believed, before August 2007, that AAA ARS were completely safe and perfectly liquid, and could be sold at auction on demand. Id. at ¶ 46. Virtually all issuing banks, including Merrill Lynch and Deutsche Bank, represented to investors and brokers that the AAA ARS issued by these banks were safe and liquid. Id. at ¶¶ 4, 46. Further, the only possibility of non-liquidity for ARS was the "failure" of an auction, meaning that more investors offered the ARS they held for sale than investors were placing bids to buy the securities. See id. at ¶ 44. However, before August 2007, no auction in AAA ARS ever failed, and the securities had essentially a perfect track record for liquidity, because issuing banks performed a market making role by simply purchasing any excess ARS at auction. Id. at ¶ 46. This maintained confidence in the market, and the universal belief that AAA ARS of any collateral were safe and liquid investments, and suitable for short term investors. Id.

On August 7, 2007, banks suddenly stopped their market making function for certain AAA ARS issues. The auctions failed and no successful auctions in those securities occurred again. Id. at ¶ 50. In February 2008, all the auctions for AAA ARS with student loan collateral failed. The ARS market currently effectively has ceased to exist. Id. at ¶¶ 35, 51. As Dr.

Raynes makes clear, its demise, and the failure of the auctions, was an unforeseen, and unforeseeable event for brokers in the industry, like Eric Butler.  Id. at ¶ 4 ("the failure of the ARS auctions, and dissolution of the market, [was] unforeseeable to brokers, such as Mr. Butler, as well as investors.")

However, the failure of the ARS auction mechanism was a liquidity failure, not a credit failure.  Id. at ¶ 55.  In other words, although investors may now lack a liquid market in which to sell their investments, that does not mean that the collateral underlying the ARS -- whether students loans, mortgages, corporate debt, or other assets -- has become worthless or even diminished in value.  As Dr. Raynes explains, "[t]he vast majority of ARS holders are still receiving interest in cash at the penalty rate set forth in the corresponding prospectus, and can be expected to receive a return of principal when the underlying security ultimately matures."  Id. Statements for the investors in this case show that they continued to receive interest even after the auctions failed in early August 2007.  A copy of the 2008 Year-End Report for investor Randgold Resources Ltd. is attached to this Memorandum as Exhibit C.[1]  Moreover, although the auction failures may have deprived investors of a readily accessible, liquid market for ARS,

---

[1]  Rating agencies continued to rate ARS collateral favorably despite the auction failures.  See, e.g., Fitch Affirms Lakeside CDO I, Ltd., Business Wire, August 30, 2007(affirming the class A-1 and A-2 tranches of Lakeside CDO I as AAA); Fitch Rates Capstan Master Trust Series 1, 2, 3 & 4, Business Wire, September 13, 2007 (affirming the Captstan Mater Trust Series 1, 2, 3 and 4 as AAA); Fitch Affirms 5 Classes of Pacific Bay CDO, Ltd., Business Wire, September 14, 2007 (affirming the class A-1 and A-2 tranches of Pacific Bay CDO, Ltd as AAA), attached collectively to this Memorandum as Exhibit D.  While most ARS holders continue to receive interest, the same cannot be said for holders of student-loan backed ARS.  Those securities often contain provisions for reduction or elimination of interest in the event of an auction failure in order to preserve trust principal.  See Raines Dec. at ¶ 63; DBRS Comments on Student Loan ABS Containing Auction-Rate Securities (Feb. 6, 2009), http://www.dbrs.com/research/226486, annexed to this Memorandum as Exhibit E; Page Perry, LLC, Ashland, Inc Sues Oppenheimer for Mismarketing Auction-Rate Securities (Apr. 23, 2009), http://www.investmentfraudlawyerblog.com/2009/04/ashland_inc_sues_oppenheimer_f.html, annexed to this Memorandum as Exhibit F ("A key problem with student loan-backed auction-rate securities is that the authorities that issued student loan auction-rate securities have little or no ability to raise additional funds to redeem them. In addition, because of a high rate of defaulted student loans and a formula designed to ensure that borrowers do not pay more interest on their debt than they receive from student-loan clients, the more than $9 billion in auction-rate bonds issued by student loan agencies have left investors holding long term bond bonds that pay little or no interest.").

secondary markets have developed where the securities can be bought and sold.  Raynes Dec. at

¶ 56;      see      also,      SecondMarket,      Auction-Rate      Securities,

http://www.secondmarket.com/markets/auction-rate-securities.html,      annexed      to      this

Memorandum as Exhibit G ("SecondMarket has emerged as the secondary market for the

approximately $160 billion in ARS that remain in the marketplace.").

> ### D.   Representations And Actions Taken By Merrill Lynch And Deutsche Bank
> To Convince The Market That ARS Were Safe And Liquid Investments
> Prior To The Demise Of The ARS Market

As Dr. Raynes has pointed out, the belief in the liquidity of auction rate securities was

based on not only the market's past performance, but also on assurances from the banks issuing

the securities.  Raynes Dec. at ¶¶ 45-46.  Merrill Lynch, Deutsche Bank, and others promoted

ARS as safe and liquid cash equivalents prior to the auctions failures in August 2007 while

trading in a manner that covered up problems in the marketplace and created the appearance of

an active market with full liquidity.

In the wake of the market's collapse, many of these distortions have come to light.  Thus,

the New York State Attorney General has entered into Assurances of Discontinuance with both

Merrill Lynch and Deutsche Bank regarding the sale of auction rate securities, and the freezing

of the auctions and failure of the market.   The Merrill Lynch Assurance is attached to this

Memorandum as Exhibit H; and the Deutsche Bank Assurance is attached to this Memorandum

as Exhibit I.  The Assurances state that the banks represented that ARS were "money market

alternatives" and liquid investments.  Exhs. H, I at ¶ 6.  The Assurances also confirm that the

banks misled the market by routinely intervening in auctions to prevent auction failures, which

created the illusion that ARS were liquid, and deprived investors of any ability to foresee that auctions could fail to any significant degree. See id. at ¶¶ 8-9.[2]

The Securities and Exchange Commission ("SEC") also has reached a preliminary settlement with Merrill Lynch. August 22, 2008 press release, annexed to this Memorandum as Exhibit J. As part of the settlement, Merrill would purchase up to $7 billion in ARS from investors. Id. The SEC has stated that it has information that the bank made misrepresentations "to thousands of its customers that ARS were safe, highly liquid investments equivalent to money market instruments and cash." Id. at p. 1. The SEC has also sued Deutsche Bank, alleging that it "misled its customers about the fundamental nature and increasing risks associated with auction rate securities . . . that it underwrote, marketed and/or sold."[3] The SEC finalized settlement with Deutsche Bank in June 2009 to restore approximately $1.3B in liquidity to Deutsche Bank customers.

These actions rendered it difficult, if not impossible, for brokers and investors to foresee that auctions would fail to any significant degree, or that any loss could occur from the illiquidity of Merrill Lynch or Deutsche Bank ARS due to failed auctions. See Raynes Dec. at ¶ 46.

### E.    The Sale Of Auction Rate Securities At Credit Suisse

During the time period relevant to this case, Credit Suisse did not issue ARS, or conduct any ARS auctions. See Testimony of James Child ("Child Test.") at p. 3036-37 (excerpts from the testimony of James Child are annexed to this Memorandum as Exhibit L). Instead, the bank provided Eric and other brokers with access to ARS, from other banks, including Merrill Lynch and Deutsche Bank, and those securities are the securities at issue in this case. Essentially,

---

[2] Both Merrill Lynch and Deutsche Bank have agreed "not to take any action or to make or permit to be made any public statement denying, directly or indirectly, any finding in [these] Assurance[s] or creating the impression that [these] Assurance[s] [are] without factual basis." Id. at ¶ 61.

[3] Securities and Exchange Commission v. Deutsche Bank Securities Inc., Docket No. 09-Cv-5174 (S.D.N.Y.); complaint annexed to this Memorandum as Exhibit K.

Credit Suisse contracted with other banks that did issue ARS, such as Merrill Lynch, Deutsche Bank, Citibank, and others, to provide Credit Suisse access to ARS to be sold by Credit Suisse brokers.  See Child Test. at p. 3087-3088.  Eric did not negotiate with any bank to obtain access to ARS auctioned by those banks.  See id.  Instead, Credit Suisse provided access to all of these products, and negotiated with the issuing bank regarding the division of the commission for the purchase of ARS as between the issuing bank and Credit Suisse; the total commission, which was static, was paid by the issuer of the securities, and never by the investor purchasing the securities.[4]  See id.

Eric was provided no training regarding ARS at Credit Suisse.  He was told, and Credit Suisse believed, that AAA-rated ARS with any collateral were safe and liquid, and suitable for corporate short term cash management.  He generally was given no information about an ARS issue, usually did not receive the prospectus for the security, and was not told its full name.  Often, his total information about a security was its appearance on a long list, provided daily, of the shortened names of securities available for purchase that day, the securities' credit ratings, price or estimated price, the date of next auction, and the amount of the issue available.  See Child Test. at pp. 3091-3095.  Mr. Butler then bid for securities, or sold securities off the list of inventory at an investment bank as fast as possible.  See id. at p. 3105.  It was a mechanical process of trying to purchase the highest yielding securities from the list.  The job had very little investment advisor aspect to it, because the products were all highly rated and designed for short term investing.  The focus was credit rating and yield.

---

[4] The purchasers of ARS, therefore, never paid any commission.  The issuer of the security paid a set commission, usually 25 basis points, on each sale, and the bank issuing the securities negotiated the division of that commission with other banks that were permitted to sell the ARS.

### III.

### THE OFFENSE

Eric focused his sales efforts on corporate investors in need of cash management tools.  A central goal of Mr. Butler was to market investments to these corporate investors, and sell them short term investments, such as auction rate securities, if the corporation needed access to money in the short term, or longer term bonds, if the corporation sought to invest for a longer period. When it came to selling ARS, Eric offered almost exclusively AAA issues.  He offered tax-exempt issues with municipal debt collateral to United States taxpayers, and taxable AAA issues to foreign corporations.  The bonds at issue in this case were taxable issues.

In approximately 2005, Credit Suisse management informed Eric that it had arranged with Merrill Lynch for Credit Suisse to have access to ARS marketed by Merrill Lynch.  This access was in the form of Eric being able to view a Merrill Lynch website with a list of the ARS issues available to be purchased from Merrill Lynch.  Little if any information regarding these Merrill Lynch ARS was provided to Mr. Butler, other than that access to them had been provided by Credit Suisse, that they were AAA-rated, and they were auctioned, for the most part, on a 28 day cycle.  Prospectuses for the securities were rarely provided.  The commission that Credit Suisse negotiated for the sale of these securities was 12.5 basis points, which at the time was the same as most other ARS issues, of all types, including ARS with student loan collateral, and was less than the 15 basis points being paid on tax exempt ARS backed by municipal debt.

Eric began to sell the Merrill Lynch securities in 2005, when they were provided by Credit Suisse, and sold them for over two years.  There were no failed auctions in any Merrill Lynch ARS during that time.  The  clearing rates on the Merrill Lynch ARS were comparable to the interest rates on all AAA ARS.

In the first week of August, 2007, Merrill Lynch stopped making a market in these securities, and every single auction failed.  This action, and similar actions by other banks at the same time, destroyed the auction rate market for these securities; in fact, it devastated confidence in the ARS structure, and effectively destroyed the entire $300 billion ARS market.  Within a few days, Deutsche Bank stopped making a market in its credit linked note and credit linked certificate auctions, and the auctions all failed, and no subsequent successful auction occurred.

While Merrill Lynch allowed the auctions in certain ARS with CDO collateral to fail, and Deutsche Bank allowed the auctions in certain ARS with credit linked note and credit linked certificates to fail, they, along with other banks, continued for a short time to intervene in the ARS market to buy excess SL ARS offered for sale and prevent these auctions from failing.  However, the SL ARS market failed as well in February 2008, and likely the entire ARS market had failed before this time, but the failure was concealed by the banks, artificially propping up the securities.

In this case, certain companies claimed that they wanted only AAA-rated SL ARS, but received AAA ARS with other collateral.  That is the claimed offense.  However, the claimed deficiency was a distinction without a material difference.  The evidence established that all the ARS Eric sold were of the highest quality, believed by him, and all market participants, and his employer, to be completely safe and as good as gold.  The failure of the auctions was a complete surprise to him, to Credit Suisse, and to the $300 billion ARS market.

Specifically, government witnesses James Child and Julian Tzolov both testified that all of the bonds at issue in this case were rated AAA by Moody's, Standard and Poors, or Fitch.  See Child Test. at pp. 3108-09; Testimony of Julian Tzolov ("Tzolov Test.") at p. 2859 (excerpts from the testimony of Julian Tzolov are attached to this Memorandum as Exhibit M).  Moreover,

these credit rating agencies were major and fundamental United States institutions, whose ratings were relied upon by Credit Suisse.  Child Test. at p. 3109.  In fact, while the government attorneys called the bonds "toxic" to the jury, the only evidence in this case, from the government's own witnesses, was that the credit worthiness of these securities was the absolute highest, and believed to be the highest by all market participants during the events in this case.  Thus, government's witness, Julian Tzolov, testified as follows:

Q      Now, every security that you sold to ST Microelectronics was triple A rated; isn't that right?

A      That is correct.

Q      And you believed that each and every one of those securities was as good as gold; isn't that right?

A      I believed that those securities were safe, absolutely.

Q      As good as gold; isn't that right?

A      I mean, that's a terminology.  I believed that they were very safe securities, absolutely.

Q      And they were all triple A rated, right?

A      Yes.

Q      And the student loans were triple A rated?

A      Yes.

Q      The non-student loans were triple A rated, right?

A      Yes.

Q      You didn't try to slip them a lower rated security, did you?

A      No, never.

Q      You only gave them triple A securities, right?

A      That's correct.

17

Tzolov Test. at p. 2859.  As the government's witnesses testified, as of August 2007, the investment community in fact viewed all AAA securities as having the same risk, which was effectively zero, and to be absolutely safe.  <u>See</u> Raynes Dec. at ¶ 3.

Finally, the government's witnesses testified that banks fully supported the auction rate market for 20 years, through the market-making activity of buying excess ARS offered for sale, to prevent failed auctions, and then offering the ARS for sale as inventory.  Tzolov Test. at p. 2862.  The testimony of the government's witnesses established that there was no intent by Eric to cause harm through the sales in this case, nor was harm reasonably foreseeable; as the government's central witness, Julian Tzolov, testified:

> Q     And the triple A auction rate securities market was considered by you to be completely safe; isn't that right?
>
> A     Yes.
>
>       . . . .
>
> Q     You believed that the position of the bank [Credit Suisse] itself was that this was safe, the triple A auction rate securities market?
>
> A     Yes, that was my understanding people view it as a safe liquid investment.

Tzolov Test. p. 2862.  The failure of auctions for AAA securities, therefore, was a complete surprise to Credit Suisse.  <u>See</u> Child Test. at p. 3107.

**IV.**

**A SENTENCE WHICH RECOGNIZES**
**THAT MR. BUTLER NEITHER INTENDED NOR COULD**
**REASONABLY FORESEE ANY HARM FROM THE SALE**
**OF AAA-RATED AUCTION RATE**
**SECURITIES IS APPROPRIATE HERE**

**A.    Introduction**

The Presentence Report calculates the Sentencing Guidelines to be life, because, it states, there was an "intended loss" of over $1 billion.  This conclusion ignores the evidence and the reality of the ARS markets.  Eric Butler intended no loss and could reasonably foresee no loss.  The risk of a failed auction, which is the injury claimed here, was unknowable, and hidden from him.  Accordingly, a much lower Guideline range – or a sentence outside the Guidelines – is warranted.

**B.    Advisory Guidelines And This Court's Sentencing Discretion**

United States v. Booker, 543 U.S. 220 (2005), holds that the Sentencing Guidelines are advisory.  Thus, while the Court should calculate the applicable Guideline range pursuant to the Sentencing Guidelines, it must then "consider all of the § 3553(a) factors" and, using these factors, "make an individualized assessment based on the facts presented."  Gall v. United States, 552 U.S. 38, 50 (2007).

This Court has broad discretion to vary from the applicable Guideline range, and "may not presume that the Guidelines range is reasonable."  Id.; Rita v. United States, 551 U.S. 338, 351 (2007) (the district court may not presume that the advisory Guideline range is reasonable).  It has "considerable discretion" to identify "the grounds that can justify a non-Guidelines sentence."  United States v. Jones, 531 F.3d 163, 172 (2d Cir. 2008).  The Court can rely on both policy disagreements with the Guidelines as well as the circumstances of a particular defendant or offense.  See Spears v. United States, -- U.S. --, 129 S. Ct. 840, 843-44 (2009).  As the Second

19

Circuit recently stated, "[s]o long as factors considered by the sentencing court are not inconsistent with those listed in § 3553(a) and are logically applied to the defendant's circumstances, we accord deference to the court's broad discretion in imposing a sentence within a statutory range."  United States v. Williams, 524 F.3d 209, 216 (2d Cir. 2008).

    **C.**    **Guidelines Calculation**

Set forth below are the Guidelines calculation contained in the Presentence Report, followed, we respectfully submit, by the accurate Guideline calculation.  This is followed by an analysis of the differences in the calculation.

    **1.**    **Presentence Report Calculation**

The counts of conviction, which were conspiracy to commit securities fraud in violation of 18 U.S.C. § 371, conspiracy to commit wire fraud in violation of 18 U.S.C. § 1349, and securities fraud in violation of 15 U.S.C. §§ 78j(b) and 78ff, group pursuant to Guideline § 3D1.2(d) and 3D1.3, such that there is no multiple count enhancement.  This, then is the Guideline calculation from the Presentence Report:

| | |
|---|---|
| Base offense level - Guideline § 2B1.1(a)(1) | 7 |
| Over $400,000,000 loss - Guideline § 2B1.1(b)(1)(P) | 30 |
| Offense involved more Than 10 victims - Guideline § 2B1.1(b)(2)(A)(i) | 2 |
| A substantial part of the offense was committed from outside the United States - Guideline § 2B1.1(b)(9)(B) | 2 |
| The defendant was a registered broker - Guideline § 2B1.1(b)(16)(A)(ii) and (iii) | 4 |

| | |
|---|---|
| The defendant was an organizer and leader and the offense involved more than 5 participants - Guideline § 3B1.1(a) | 4 |
| Total - | 49 |

This results in a Guideline range of 540 months, based upon statutory maximums totaling 45 years.

### 2.    **Defendant's Calculation**

The following is the defendant's Guideline calculation, which not only is accurate pursuant to the Guideline language and policies, but also, unlike the Presentence Report's calculation, is consistent with the statutory considerations found in 18 U.S.C. § 3553(a).

| | |
|---|---|
| Base offense level - Guideline § 2B1.1(a)(1) | 7 |
| No loss, because the defendant neither intended nor could reasonably foresee a loss. Guideline § 2B1.1, Application Notes 3(A)(i-iv) | 0[5] |
| The defendant was a person associated with a broker - Guideline § 2B1.1(b)(16)(A)(ii) | 4 |
| Total - 11 | |

---

[5] It is clear, as described below, that Eric Butler neither intended nor could foresee a loss in this matter.  Indeed, the Presentence Report attempts no analysis of loss beyond the obviously mistaken statement that a loss was intended, and neither the Presentence Report nor the government's submission even attempts to explain any relationship between Eric Butler's sale of securities and the failure of auctions that led to the purported losses here.  Nor, with small exception, have the alleged victims, many of which were not part of the trial here, apparently set forth any loss in a loss statement.  Accordingly, there was no loss here.  While there is no loss, the government, in its submission to the Court, has set forth an alternative "gain" calculation that is inaccurate and inflated.  As discussed below in Section IV.D.3.,  an accurate calculation of gain from the sale of non-SL ARS, compared to what would have been earned in commissions by Eric Butler from the sale of SL ARS, is approximately $100,000.  This "gain" would result in an increase of 8 levels pursuant to Guideline § 2B1.1(b), for an adjusted Guideline level of 19, which carries a sentence of between 30-37 months.

This calculation results in a Guideline range of 8-14 months in Zone C of the Guidelines. This Zone permits a split sentence between imprisonment and community confinement or home detention, in combination with a term of supervised release.

The primary difference between the Presentence Report and the correct analysis offered by defendant is the calculation of loss.[6]

### D.    Guidelines Analysis

The government bears the burden of proof on all facts underlying a sentencing enhancement pursuant to the Sentencing Guidelines. United States v. Zolp, 479 F.3d 715, 718 (9th Cir. 2007). When the government seeks a large enhancement based upon the loss table found in Guideline § 2B1.1(b), a "clear and convincing" standard of proof applies. Id. (internal citations omitted). Even under the advisory Guidelines regime, moreover, the Sixth Amendment may limit the extent to which a court can impose a substantial loss enhancement. See Rita, 551 U.S. at 368-75 (Scalia, J., concurring in part).

The defendant agrees with the Presentence Report that the offenses of conviction "group" pursuant to Guideline § 3D1.2(d) and 3D1.3, such that there is no multiple count enhancement, and that the base offense level pursuant to Guideline § 2B1.1(a)(1) is 7. There is, however, a substantial disagreement regarding the "loss" figure that should be used pursuant to the chart set forth in Guideline § 2B1.1(b).

### 1.    There Is No Reasonably Foreseeable Or Intended Loss Pursuant To Guideline Section 2B1.1(b)(1)

The analysis of the Presentence Report regarding loss pursuant to Guideline Section 2B1.1(b) states that Eric Butler is responsible for an intended and actual loss of $1,122,000,000.

---

[6] In its submission the Government presented an inflated and inappropriate measure of the purported gain in commission as between the sale of non-SL ARS and SL ARS. The correct amount of gain was approximately $100,000.00, set forth below.

This represents the amount that companies listed on a chart set forth in paragraph 27 of the Report paid for non-SL ARS, which they held in August 2007 when the market failed.  The claimed loss analysis is set forth in paragraphs 27-29 of the Presentence Report.  These paragraphs are rife with factual inaccuracies, which are set forth in the separate objections to the Presentence Report.  Of singular importance here, though, is that the Presentence Report points to no evidence indicating that Eric Butler (or any investor or broker) could have reasonably foreseen that Merrill Lynch and Deutsche Bank would suddenly choose to stop making a market in the non-SL ARS and cause the very damage now attributed to Eric Butler, a mere salesman. Simply put, there is no loss causation here, or, stated otherwise, the offenses of conviction were not the proximate cause of the illiquidity of the ARS, which illiquidity is the *sole* measure of damages used in the Presentence Report.

Guidelines § 2B1.1(b)(1), with its Application Notes, itself requires that the offense of conviction actively cause the loss, and be the proximate cause of the loss, for any injury that is sought to be attributed to the defendant's conduct.  Section 2B1.1(b)(1) provides that the offense level is increased based upon the extent of the "loss," as set forth in the chart found in that section.  While no definition of "loss" is provided in that Section, the Application Notes to Guideline § 2B1.1 define the concept of "loss" in detail.  These definitions, found at Guideline § 2B1.1, Application Note 3(A)(i)-(iv) state:

> 3.      Loss Under Subsection (b)(1). -- This application note applies to the determination of loss under subsection (b)(1).
>
> (A)      General Rule. -- Subject to the exclusions in subdivision (D), loss is the greater of *actual loss* or *intended loss*.
>
> (i)      Actual Loss. --  "Actual loss" means the *reasonably foreseeable* pecuniary harm that resulted from the offense.
>
> (ii)      Intended Loss. -- "Intended loss" (I) means the pecuniary harm *that was intended* to result from the offense; and (II) includes

> intended pecuniary harm that would have been impossible or
> unlikely to occur (e.g., as in a government sting operation, or an
> insurance fraud in which the claim exceeded the insured value).

> (iii)    Pecuniary Harm. -- "Pecuniary harm" means harm that is monetary
>          or that otherwise is readily measurable in money. Accordingly,
>          pecuniary harm does not include emotional distress, harm to
>          reputation, or other non-economic harm.

> (iv)     Reasonably Foreseeable Pecuniary Harm. -- For purposes of this
>          guideline, "reasonably foreseeable pecuniary harm" means
>          pecuniary harm that the defendant *knew or*, under the
>          circumstances, *reasonably should have known*, was a potential
>          result of the offense.[7]

Therefore, for Eric Butler to be held accountable for the purchase price of the non-SL ARS that became illiquid in early August 2007, he must have intended the result that the securities would become illiquid, or must have known, or reasonably should have known, that this illiquidity was a potential result of his conduct.  Because he neither intended, nor could reasonably foresee any loss arising from his conduct, no loss is attributable to Mr. Butler.

The Second Circuit has instructed that the term "[i]ntended loss refers to the defendant's *subjective expectation*, not to the risk of loss to which he may have exposed his victims."  United States v. Confredo, 528 F.3d 143, 152 (2d Cir. 2008) (emphasis added; internal citations omitted) (discussing then Guideline § 2F1.1, later consolidated with Guideline § 2B1.1).  In United States v. Confredo, for example, the Second Circuit remanded the case to the district court for consideration of whether, in making fraudulent loan applications to banks, the defendant intended to deprive the bank of the full amount of the loans, or subjectively intended that some of the loans would be repaid, and thus did not intend to deprive the bank of the full face amounts of the loans.  528 F.3d at 152.  Under a theory of "intended loss," only the amount that the

---

[7] Emphasis has been added.

defendant actually intended the financial institution to lose was held to be attributable to the defendant. Id.

Here, there is no question that Eric Butler did not intend to deprive any investor in non-SL ARS of any money at all. The evidence at trial established beyond dispute that Eric intended only a gain, and intended that the investor could sell its AAA-rated debt security at a subsequent auction, as had been the case for decades. See, e.g. Tzolov Test. at pp. 2859, 2862; Section III, supra. Thus, there was no intended loss.

There also was no "actual loss," because no loss was reasonably foreseeable. United States v. Giggey, 501 F.Supp.2d 237 (D. Me. 2007) provides a good example of the application of the principle that "actual loss" pursuant to Guideline § 2B1.1(b) and Application Note 3(A)(iv) is limited to "reasonably foreseeable pecuniary harm" – which does not include damages caused by the unforeseen conduct of third parties. 501 F.Supp. 2d at 239. In that case, the defendant was convicted of the arson of a commercial building undergoing renovations. Id. at 240. The fair market value of the building was between $700-800 thousand dollars. Id. Following the fire, the owners of the building submitted an insurance claim for over $5 million, based upon the value of the property after renovation, and settled with their insurer for $3,200,000, which was paid. Id. The government argued that the defendant "reasonably should have known that the property was insured for more than the owners had invested in it ($500,000) and for more than they were willing to sell it for ($700,000-$800,000)," and thus that "the 'actual loss' for offense level purposes should be the full amount that [the insurance company] . . . paid, namely $3,200,000." Id. The court disagreed, and held that "it was [not] reasonably foreseeable to [defendant] Giggey under the circumstances that this vacant building would generate an insurance settlement many times that of its fair market value." Id. Instead, the court held, the

25

"actual loss" was appropriately limited to the harm the defendant could reasonably foresee from the offense, which was the value of the building which he intentionally destroyed.  Id.

Here, Eric Butler sold AAA-rated auction rate securities, which he expected to be resold within approximately 28 days, and that all bore a AAA rating and decades-long maturity dates, meaning that they were fully expected to pay for many years to come.  An entire segment of the ARS market, and then the entire market, completely failed, causing the harm complained of here. As in United States v. Giggey, this occurrence was unforeseeable to Mr. Butler or to any participant in the market, whether broker or investor.

Under the Guidelines, moreover, the government must prove that Mr. Butler could have foreseen not only the failure of the ARS market, but also that investors would suffer losses *because of his alleged misconduct – i.e.*, the sale of non-student loan ARS when investors requested student loan ARS.  This the government cannot do.  The student-loan auctions, no less than the non-student loan auctions, ultimately failed.  Thus, investors in student-loan ARS would be in no better position than the investors here.  The government speculates that, because a few months elapsed between the two failures, student-loan investors might have liquidated their positions.  But it is inconceivable that a broker like Mr. Butler could have foreseen, not only that the auctions would fail, but that they would fail at two different times so that an investor's ability to liquidate its holdings would depend on the precise type of AAA-rated auction rate security it held.  Simply put, any injury caused by the ending of the ARS market was unrelated to conduct of Mr. Butler, and was unforeseeable.  Losses caused by the failure of the market, therefore, are not "actual loss" caused by Mr. Butler's actions.

Defendant invites this court to review closely the declaration of Dr. Raynes.  It clearly sets forth the circumstances surrounding the failure of the auction rate securities markets and

concludes, "one cannot fault a single broker like Eric Butler for failing to foresee auction failures that no one else saw coming."  See Raynes Dec. ¶ 66.

### 2.      Mr. Butler's Actions Were Not The Proximate Cause Of Any Loss Here

Furthermore, for a sentencing enhancement for loss to be applied pursuant to Guideline § 2B1.1(b), it is settled law in the Second Circuit that "[t]he loss must be the result of the fraud," and "[l]osses from causes other than the fraud must be excluded from the loss calculations." United States v. Ebbers, 458 F.3d 110, 128 (2d Cir. 2006).  In other words, the government must prove that "the misrepresentation proximately caused the economic loss," and losses caused by "market or other forces" are excluded from the calculation.  See United States v. Rutkoske, 506 F.3d 170, 179 (2d Cir. 2007).  Proof, therefore, that a defendant's actions were "cause-in-fact," in the sense that "but for" the defendant's actions no loss would have occurred, is insufficient. United States v. Olis, 429 F.3d 540, 546 (5th Cir. 2005).   The government must affirmatively prove that the defendant's actions were the proximate cause of the loss, meaning that the government must prove that the defendant's actions, for which he was convicted, were the active cause of the loss.  Id.[8]

For example, in Rutkoske, using the loss causation principles found in civil securities fraud cases as "useful guidance" in applying the Sentencing Guidelines, the Second Circuit remanded the case for resentencing, because the district court had not considered whether market or other outside forces had contributed to the decline in value of a security.  506 F.3d at 179 (citing, as an example of this "useful guidance," Dura Pharmaceuticals, Inc. v. Broudo, 544 U.S.

---

[8] As the Fifth Circuit described this settled concept: [E]ven though A's conduct may actually cause B's [injury], his conduct is not necessarily the 'legal' (or 'proximate') cause of B's [injury]," and "the requirement of [legal] causation in criminal law, more often than not, serves not to free defendants from all liability, but rather to limit the punishment consistent with accepted theories of punishment."  Olis, 429 F.3d 546 n. 6 (quoting Wayne R. Lafave, Substantive Criminal Law, § 6.4(c) 2d  ed. 2003).

336 (2005)).  The Second Circuit held that even if fraud had occurred, the government must prove that the fraud, and not some other force, caused the loss at issue.  Id.  The court further explained that while there may be significant "complexities inherent in calculating the loss amount," if the government does not prove that the loss was the "result of the fraud," but caused by some other action or event, the loss may not be attributed to the defendant pursuant to the Sentencing Guidelines.  Id. at 189.

In Dura, the plaintiffs alleged that they purchased a security at a price that was inflated due to a misrepresentation by the issuer.  544 U.S. at 338.  They claimed that the issuer made false statements concerning its profits and its prospects for gaining approval of a new drug, which had the effect of increasing the price of the security, and causing the plaintiffs to purchase the security.  Id. at 338.

The Ninth Circuit Court found that the Dura plaintiffs had established loss causation because they had "shown that the price *on the date of purchase* was inflated because of the misrepresentation."  Id. (quoting Dura Pharmaceuticals, Inc. v. Broudo, 339 F.3d 933, 938 (9th Cir. 2003)).  The Supreme Court, disagreed, first noting that, logically, purchasing a security, even one purchased at an artificially inflated price, has not caused a loss at the moment of purchase, because the buyer "possesses equivalent value."  Id. at 342.  Moreover, the Court found, although the share price decreased after the plaintiff purchase of the security, "even at a lower price, that lower price may reflect, not the earlier misrepresentation, but changed economic circumstances, changed investor expectations, new industry-specific or firm-specific facts, conditions, or other events, which taken separately or together account for some or all of that lower price."  Id. at 343.  Therefore, the Supreme Court rejected the argument that a defendant's

fraudulent statement or action that induces a securities purchase alone establishes proximate cause for the investors losses, if the security later declines in price.  See id.

Here, in attempting to attribute over $1 billion in losses to Eric Butler, the government alleges nothing more than that a false statement caused the purchase of a security, which later became impaired (see Gov. Mem. at p. 15), the precise theory of loss causation that was rejected by the Supreme Court in Dura.  The government's inability to allege anything beyond that reflects the fact that Eric had nothing to do with the failure of the ARS auctions or the impairment of the liquidity of the securities.  Thus, the government has not asserted, and cannot prove, loss causation, or that the defendant's actions were the proximate cause of any loss, and no loss from the illiquidity of securities due to failed auctions is attributable to him.

Instead, the loss, as is well known, was caused by the actions of investment banks.  In the first week of August, 2007, Merrill Lynch, Deutsche Bank, Lehman Brothers, and other banks allowed auctions to fail in various types of securities, after supporting the auctions and preventing illiquidity in these securities for decades.  These banks, and all banks, later stopped supporting the entire ARS market, and by February 2008 the banks allowed all the auctions to fail, and the market was dead.  It remains dead.  See Raynes Dec. ¶ 51.

It is not known whether the auctions for SL ARS all failed in fact in August 2007, but were supported by the banks for a few months.  It is not known who at Merrill Lynch, or Deutsche Bank, made the decision to fail the auctions in August 2007.  Nor is it known why the banks picked this date, or how long the auctions had been failing before this, and secretly supported by the banks.  Contrary to the government's repeated statements in its memorandum, there is absolutely no proof that there was less demand for non-SL ARS, or that they were more "risky."  Indeed, the proof generally shows the opposite, with *more* student loan securities

available generally.  In any event, it is not known, and likely will never accurately be known, why the auctions failed in August 2007.

For the purposes of this case, however, this much is clear:  there is no proof that Eric Butler, or his sale of AAA-rated non-SL ARS, had anything to do with these auction failures, and there never will be such proof.  The government has not and cannot sustain its burden of proof to show that the sale of non-SL ARS by Eric Butler was the proximate cause of any loss in this case.

Finally, even if there were some basis for concluding that any of the alleged losses were proximately caused by Mr. Butler's conduct – and there is not – the government has utterly failed to offer a plausible estimate of what that loss might be.  The government bears the burden of proving a "reasonable estimate" of the loss.  See U.S.S.G. § 2B1.1 n. 3(C); United States v. Deutsch, 987 F.2d 878, 886 (2d Cir. 1993).  In fraud cases, that loss is the difference in value between the property promised and the property received.  See United States v. Leonard, 529 F.3d 83, 92-93 (2d Cir. 2008); United States v. Crandall, 525 F.3d 907, 912-15 (9th Cir. 2008).  The government has not even attempted to prove that difference.  Thus, even if Mr. Butler's conduct did somehow proximately cause a loss, the government has failed to offer any evidence of what the amount of that loss is.

### 3.    The Government's Alternate "Gain" Calculation

Alternatively, the government urges the Court to enhance Mr. Butler's sentence based on the amount of gain.  Gov. Mem. at pp. 26-28.  Under the Guidelines, however, "[t]he court shall use the gain that resulted from the offense as an alternative measure of loss only if *there is a loss but it reasonably cannot be determined*."  U.S.S.G. § 2B1.1 n. 3(B) (emphasis added).  Here, the government has failed to show that "there is a loss":  Any financial consequences suffered from the auction failures were neither intended nor reasonably foreseeable, and thus were not a "loss"

30

within the meaning of the Guidelines.  Where there is no loss, the court cannot enhance the defendant's sentence based on the amount of gain.  See United States v. Robie, 166 F.3d 444, 454-56 (2d Cir. 1999).  In addition, the government has not proved that any loss "reasonably cannot be determined."  Rather, it has simply failed to offer any proper evidence of what the amount of loss is, relying instead on a contrived and wildly exaggerated billion-dollar figure based on total purchase price.  In those circumstances too, the Guidelines do not permit an enhancement based on the amount of gain.  See United States v. Miller, 588 F.3d 560, 567 (8th Cir. 2009).  Accordingly, the Court should apply only the base offense level of 7.  U.S.S.G. § 2B1.1(a)(1).

If the Court nonetheless determines that an enhancement based on the amount of gain is appropriate, it should reject the government's estimate.  The government calculates gain as the sum of two amounts:  (1) $320,948 in commissions received while at Credit Suisse (which includes both $252,384 for charged conduct and an additional $68,563 for uncharged conduct); and (2) the $4.45 million forgivable loan from Morgan Stanley.  Gov. Mem. at pp. 26-28, 34-38. The former number is too high and the latter number should not be included in the gain at all.

### a.    Credit Suisse Commissions

The government's $320,948 figure for Credit Suisse commissions is inflated for a number of reasons.  First, the government improperly calculates that figure based on the *total* amount of commissions received from the investors at issue, rather than the difference in commission rates between student loan and non-student loan ARS.[9]  The government's theory of the case was that Mr. Butler sold investors non-student loan ARS when they asked for student loan ARS.  He supposedly did this because, among other things, the non-student loan ARS paid

---

[9] This amount also appears to improperly include substantial commission earned for the sale of other financial products to these companies, such as commercial paper, or agency bonds.

higher commissions.  But Mr. Butler would have earned *some* commissions even if he had sold investors student loan ARS as requested.  Consequently, the only amount properly classified as improper "gain" is the *additional* amount of commissions earned -- *i.e.*, the difference in commission rates between the two types of ARS.[10]

According to the government's witnesses at trial, the commissions on student loan ARS were "between five and ten basis points," while the commissions on non-student loan ARS were "twelve and a half basis points across the board."  See, e.g., Tzolov Test. at p. 2154.  Thus, the difference in commission rates was approximately 5 basis points, *i.e.*, 40% of the total gross amount of 12.5 basis points.  Accordingly, the appropriate gain figures are at most 40% of the gross figures on which the government relies -- *i.e.*, $128,379 for all sixteen investors, or $100,954 for the six investors at trial.  A more detailed calculation based on the actual amounts of commission differences on individual trades produces approximately the same results:  a gain of between approximately $86,625.28 and $117,136.75.  This calculation is appended to this Memorandum as Exhibit N.

Second, the Court should exclude the commissions associated with the ten investors about whom no evidence was presented at trial.  Although a court may consider uncharged "relevant conduct" at sentencing, the government must prove such allegations with evidence that is accurate and reliable.  See United States v. Juwa, 508 F.3d 694, 700-01 (2d Cir. 2007).  The only evidence the government offers here is an FBI investigator's vague and inconclusive notes regarding an interview with Julian Tzolov, which plainly do not meet that standard.  See Gov. Mem. at pp. 7-8.  Accordingly, the appropriate gain is at most the $100,954 figure based on the

---

[10] The government contends that Mr. Butler sometimes could not obtain sufficient student loan ARS to allocate all funds that clients wanted to invest.  See Gov. Mem. at p. 6.  But the government offers no evidence of how often this was the case.  It cannot justify using the entire gross amount of commissions merely because, in some unknown number of cases, it may not have been possible to sell student loan ARS at all.

charged conduct only, not the $128,379 figure that includes both charged and uncharged conduct.

Finally, the government's gain figure is inflated because, by the government's own admission, it includes *all* commissions received from sales to the investors at issue -- not just the allegedly fraudulently provided non-student loan ARS, but student loan ARS and other securities that were not ARS at all.  See Gov. Mem. at pp. 36-37.  The government justifies including those other commissions on the theory that, "[i]f the defendant and Tzolov had not been able to fully allocate the[] clients, the clients may have abandoned the auction rate securities market completely."  Id. at 36.  But the fact that Mr. Butler provided valuable, lawful services to his clients in addition to the sales that the government contends were unlawful does not somehow transform the proceeds from those lawful transactions into unlawful gains.  The government's sentencing memorandum does not break down the commissions by category, and as a result there is no way to tell how much of the $100,954 represents concededly lawful sales commissions.  But the government's failure to exclude those amounts means that even this figure is substantially overstated.

### b.   Morgan Stanley Forgivable Loan

The government also seeks to include the $4.45 million forgivable loan that Morgan Stanley provided to Mr. Butler when he began employment there.  The Court should reject that claim for multiple reasons as well.

First, the government has failed to prove that any significant portion of the loan was based in any way on the ARS sales at issue.  The government relies on Julian Tzolov's testimony that the loan "was based on 'the last . . . twelve months of production' when they were both working at Credit Suisse."  Gov. Mem. at p. 38 (quoting Tzolov Test. at pp. 2169-70).  Tzolov testified that "*some* of that money was based on the fraud that [he was] engaged in."  Tzolov

Test. at p. 2170 (emphasis added). But the fact that some unknown portion of Mr. Butler's overall "production" related to the ARS transactions at issue does not prove that the entire Morgan Stanley loan is attributable to those transactions. The ARS sales at issue were only a tiny portion of Mr. Butler's work at Credit Suisse, as is evident from the fact that Mr. Butler's total commissions earned in 2006 and 2007 were approximately $2.2 million (see Tzolov Test. at p. 2210), while the commissions from accused ARS sales, even by the government's inflated figures, were only $320,948. The government has not provided any data from which the Court could determine how much of the trailing twelve months of "production" related to the ARS as opposed to other securities.

Second, even if the Court could somehow quantify that amount, it would not be appropriate to include it in the "gain" because the Morgan Stanley loan was not a proximate or foreseeable consequence of the ARS sales. The Guidelines authorize the use of "gain" only on the theory that it is a reasonable proxy for loss. See United States v. Chatterji, 46 F.3d 1336, 1340 (4th Cir. 1995). Consequently, the same standards of foreseeability and proximate cause that govern loss calculations also apply to gain calculations. See U.S.S.G. § 2B1.1 n.3(A)-(B). Morgan Stanley's subsequent decision to calculate Mr. Butler's signing compensation based on a production figure that may have included some small portion of earlier ARS sales at another firm is far too indirect and attenuated a consequence of the alleged misconduct to satisfy that requirement.

### 4. Enhancements For The Number Of Purported Victims, For Substantial Conduct From "Outside of the United States," And For Role In The Offense Are Inapplicable Here

Both the PSR and the government's memorandum seek a 2-level enhancement pursuant to Guideline § 2B1.1(b)(2)(A)(i) for an offense involving 10 or more victims, a 2-level enhancement pursuant to Guideline § 2B1.1(b)(9)(B) purportedly because "a substantial part of

the offense was committed from outside of the United States," and a 4-level enhancement pursuant to Guideline § 3B1.1(a) for being the "organizer or leader" of "criminal activity that involved five or more participants or was otherwise extensive." The Guideline enhancements, however, are not applicable here, and should be part of the Guideline calculation.

### a.   A Guidelines Enhancement For 10 Or More Victims Does Not Apply Here

The PSR states that Guideline § 2B1.1(b)(2)(A) applies here, because the offense involved more than 10 "victims." PSR ¶ 49. Application Note 1 to Guideline Section 2B1.1 defines "victim" as "(A) any person who sustained any part of the actual loss determined under subsection (b)([the "loss "table]; or (B) any individual who sustained bodily injury as a result of the offense." As set forth above at Section IV(D)(1) of this Memorandum, there was no actual loss for Guidelines purposes here, and thus no company sustained any part of that loss, and the enhancement found in Section 2B1.1(b)(2)(A) is not applicable. See Miller, 588 F.3d at 567.

Furthermore, the government presented evidence regarding 6 companies at trial. The additional companies listed in the PSR not only sustained no loss as explained above, but also were not part of any scheme to defraud, and for this additional reason should not be treated as "victims" to attempt to raise the Guideline level here pursuant to Section 2B1.1(b)(2)(A).

### b.   A Guideline Enhancement For Committing A Crime From A Foreign Country Has No Application Here

Guideline § 2B1.1(b)(9)(B) provides a sentencing enhancement if "a substantial part of the offense was committed from outside of the United States." The rationale for this enhancement is that:

> Offenses that involve the use of financial transactions or financial accounts outside the United States in an effort to conceal illicit profits and criminal conduct involve a particularly high level of sophistication and complexity. These offenses are difficult to detect and require costly investigations and prosecutions.

>Diplomatic processes often must be used to secure testimony and
>evidence beyond the jurisdiction of United States courts.

Guideline § 2B1.1, Background, ¶ 7.  Guideline § 2B1.1(b)(9)(B) was added by Amendment

577, which explained that the enhancement was designed "to provide an increase for fraud

offenses that involve conduct, such as sophisticated concealment, that makes it difficult for law

enforcement authorities to discover the offense or apprehend the offender."  U.S.S.G. app. C,

amend. 577.  The amendment continued:

>[This provision] address[es] conduct that the Commission has been
>informed often relates to telemarketing fraud, although the conduct
>also may occur in connection with fraudulent schemes perpetrated
>by other means. Specifically, the Commission has been informed
>that fraudulent telemarketers increasingly are conducting their
>operations from Canada and other locations outside the United
>States. Additionally, testimony offered at a Commission hearing on
>telemarketing fraud indicated that telemarketers often relocate their
>schemes to other jurisdictions once they know or suspect that
>enforcement authorities have discovered the scheme. Both types of
>conduct are specifically covered by the new enhancement.

Id.; see also Pub. L. No. 105-184, § 6(c)(2), 112 Stat. 520 (1998) (directing Sentencing

Commission to adopt this enhancement in order to "provide an additional appropriate sentencing

enhancement, if the offense involved sophisticated means, including but not limited to

sophisticated concealment efforts, such as perpetrating the offense from outside the United

States").

Here, there was no substantial conduct that occurred outside of the United States.

Instead, essentially all of the defendant's conduct was comprised of telephone calls and emails

sent from Manhattan.  Mr. Butler made brief visits to some, but not all, of the companies for

which proof was offered at trial, and did not visit others, such as Copa Airlines and Potash

Corporation.  Nothing about these brief visits made any gathering of the facts by law

enforcement more difficult, or had anything to do with concealment.  Therefore, not only were

these brief visits not a "substantial part" of the offense, but the visits did not cause any special difficulties for law enforcement arising from the location of the visits outside of the United States.

Moreover, the enhancement by its terms applies only to offenses "committed *from* outside of the United States," not offenses "committed *while* outside the United States" or offenses "committed outside the United States" generally.  That use of the word "from" implies that the enhancement applies only to misconduct directed at the United States from abroad, not misconduct committed outside the United States of whatever sort.  That narrower focus reflects the provision's drafting history quoted above, which focuses on offenders who conduct telemarketing or other fraudulent schemes *from* abroad in order to evade U.S. jurisdiction; not defendants who travel to foreign countries to meet with investors who merely happen to reside in those countries.

### c.   A Role Enhancement Pursuant To Guideline Section 3B1.1 Is Not Appropriate In This Case

The PSR includes an enhancement pursuant to Guideline § 3B1.1(a), because, the PSR states, the defendant "was the organizer and leader of this offense which involved more than 5 participants."   PSR ¶ 53.[11]   Application Note 1 to that Guideline Section, however, defines a "participant" as "a person who is criminally responsible for the commission of the offense, but need not have been convicted."  Thus, a person who has no criminal intent is not a "participant," and cannot be counted as the "more than 5" participants required by this Guideline section.

The presentence report asserts that this provision applies because Eric Butler and Mr. Tzolov directed their five sales assistants to falsify the names of securities sent to clients. PSR ¶ 30.  The government, however, identifies no evidence that the assistants were "criminally

---

[11] Guideline § 3B1.1(a) actually reads "5 or more participants."

responsible for the commission of the offense."   Tzolov testified at trial that the assistants performed essentially ministerial, administrative duties and had no responsibility for investment or allocation decisions.   See Tzolov Test. at pp. 2327-28, 2379-82.   He specifically denied that the sales assistants were complicit:   "[U]ntil the end, . . . they didn't know the specific mandates from a lot of these clients because they didn't participate in the meetings and pitches that we made to a lot of those clients."   Id. at p. 2731.   "[W]e never specified guaranteed student loans versus anything else.   For example, they didn't know that ST Microelectronics could only buy student loans, that Roche the same situation could buy only government guaranteed student loans."   Id. at 2751.[12]   Having argued to the jury that the sales assistants were unwitting participants with only administrative duties, the government cannot now be heard to claim that they were all "criminally responsible for the commission of the offense" instead.

### E.   A Non-Guidelines Sentence Is Appropriate Here

The government provided the Probation Department, and provides this Court, with a single theory of "loss" pursuant to Guideline § 2B1.1(b)(1), which was that the full purchase price of securities purchased by certain companies constitutes "loss" pursuant to that Guideline Section.   The government's contention is inaccurate for many reasons, including that this calculation is premised entirely upon the permanent failure of the auctions, which Mr. Butler both could not have reasonably foreseen and which were independently caused by events unrelated to Mr. Butler's actions.   The government also makes no attempt to value the securities currently held, discuss the actual amount of interest that they are paying, compare their value to ARS with student loan collateral, or address that the quality of the non-SL ARS currently is

---

[12] The PSR's claim that the defendants directed sales assistants to falsify e-mails is apparently based on a single e-mail from Tzolov, which states in its entirety:   "Jon, please never put 'CDO' in the trade confirmations.   Use 'Funding' instead.   Thx."   GX 10I; Tzolov Test. at pp. 2384-85.   If the sales assistants had no knowledge of the restrictions on the clients' investments policies, however, this single e-mail cannot reasonably be thought to have put them on notice that they were modifying names *in order to defraud investors*.

comparable to the quality of the SL ARS, such that there is no loss for this additional reason, among others.  See, Raynes Dec. ¶¶ 59-65.

While ignoring these flaws, the government simply claims a loss of $1 billion pursuant to Guideline § 2B1.1(b)(1), and states that the Sentencing Guidelines are life in this case.  It then argues that although the Guidelines are life, a 15 year sentence is called for here.

A 15 year sentence for a defendant who affirmatively desired that his customers benefit from his conduct, who did not intend harm any person or entity, and who did not perceive any risk of harm to anyone from his actions, is far beyond what would be an appropriate sentence in this case.  See below at Section V (analyzing the Section 3553 factors).  The defendant's view as stated is that the loss figure and resulting Guideline calculation should reflect that the damages claimed here were not foreseeable and not caused by Mr. Butler, and thus are not part of the "loss" for Guidelines purposes.   Nevertheless, if the Guidelines figure advocated by the government were accurate, which it is not, as set forth below downward departure would be fundamentally appropriate and required.[13]   Finally, and most importantly, the Section 3553 factors establish that a sentence that permits Mr. Butler to strongly maintain his family relationships, provide for his family, recover from this prosecution and live a fully productive life, is the appropriate sentence.

### 1.    The PSR's Loss Calculation Overstates<br>The Seriousness Of The Offense

If the Court adopts the government's or PSR's calculation of loss, the Court should either exercise its authority under United States v. Booker, 543 U.S. 220 (2005), to impose a non-Guidelines sentence, or else adopt a significant downward departure under the Guidelines,

---

[13]   It is noted that the government, by conceding that the defendant should not be sentenced pursuant to the Guidelines, although it Guidelines analysis is not accurate, has consented both to a non-Guideline sentence and to downward departures.

because this calculation would so overstate the seriousness of the offense as to provide no guidance whatsoever at sentencing. Application Note 19(C) to Guideline § 2B1.1 specifically provides that "[t]here may be cases in which the offense level determined under this guideline substantially overstates the seriousness of the offense. In such cases, a downward departure may be warranted." The Guideline calculation advocated by the government and PSR, if adopted by the Court, is within the core of Application Note 19(C).

This Court, with many courts and commentators, has long recognized the obvious and fundamental unfairness caused by a disconnection between a purported objective measure of harm found in a Guideline enhancement, and the defendant's lack knowledge and intent to cause the harm the Guideline at issue may punish severely. See, e.g., United States v. Handy, 570 F.Supp.2d 437, 440 (E.D.N.Y. 2008) (Guideline enhancement for a stolen gun, when the defendant did not know the gun was stolen, was fundamentally unfair and could not properly be applied); United States v. Emmenegger, 329 F.Supp.2d 416, 427 (S.D.N.Y. 2004) (the Guideline "loss" table can be a highly inaccurate measure of culpability); United States v. Mueffelman, 400 F.Supp.2d 368, 373 (D. Mass. 2007) (same); Bowman, Sentencing High-Loss Corporate Insider Frauds after Booker, 20 Fed. Sent. Rpt. 167, 171 (Feb. 2008) (same). As Judge Lynch aptly stated regarding the Guidelines' "loss" table:

> "[i]n many cases . . . the amount stolen is a relatively weak indicator of moral seriousness of the offense or the need for deterrence." Loss may well be a kind of accident, depending on the fortuities of law enforcement or even the market, as much as the defendant's culpability.

Emmenegger, 329 F.Supp.2d at 427. There is a vast distinction in culpability between a defendant who does not intend to cause a loss by his conduct, and a defendant who intends to steal money from a victim for the defendant's personal benefit, and in the first instance the Guideline's loss table may drastically overstate the culpability of the defendant. See United

<u>States v. Eagleton</u>, Case No. 97-10090, 1997 WL 753423, at *1 (9th Cir. Nov. 28, 1997) (unpublished decision) (internal citation omitted).

Here, the gulf between Eric Butler's intentions and moral culpability on one hand, and the government's position regarding the application of Guideline § 2B1.1(b), is vast.  The defendant intended no loss, and no loss was reasonably foreseeable.  Therefore, the "loss" chart found in Guideline § 2B1.1(b) fundamentally overstates his culpability, and provides no rational basis for a measurement of culpability at all if employed as the government argues, which is simply to call the "loss" the purchase price of an auction rate security because the security is illiquid, when the illiquidity was caused solely by the dissolution of the ARS market, and through no fault of the defendant.   <u>See</u> <u>Handy</u>, 570 F.Supp.2d at 440.   Consequently, a substantially below-Guidelines sentence, essentially ignoring Guideline Section 2B1.1(b), is appropriate here.

### 2.   A Combination Of Additional Bases Support A Non-Guidelines Sentence

Other strong bases for a non-Guidelines sentence or downward departure exist here as well.  Eric Butler plays a foundational role in his family, and in the care of his 2 year old son. He has an extraordinary relationship with his very young son.  He has been, in essence, the primary caregiver for him for his son's entire life.

This Court has held that a downward departure is fully appropriate in situations in which "[a] sentence without a downward departure would contribute to the needless suffering of young, innocent children."   <u>United States v. Hammond</u>,   37 F.Supp.2d 204, 207 (E.D.N.Y. 1999) (internal citation, omitted).  Eric Butler has cared personally and attentively for his son since the day he was born.  His son will suffer enormously from Eric's absence.  As set forth below in Section V discussing the sentencing factors found in 18 U.S.C. § 3553(a), a sentence that causes

41

this suffering is not necessary in a case like this where the defendant poses no danger, and never will pose any danger, to the community or to any person.

Furthermore, this case already has, and will permanently, prevent Eric from working in his profession, and has resulted in the destruction of his livelihood and business.  As this Court has stated "[t]he court may depart downward where defendant's business has been destroyed," preventing the offense from recurring.  United States v. Speed Joyeros, S.A., 204 F.Supp.2d 412, 440 (E.D.N.Y. 2002) (citing United States v. Gaind, 829 F.Supp. 669 (S.D.N.Y. 1993) (in Gaind, a downward departure was found to be appropriate, when the defendant's offense involved fraud in his profession as an EPA tester, and as a consequence of the prosecution his livelihood was destroyed and he could not reenter the testing profession).

The conviction in this matter will result in Eric Butler being personally barred by the Securities and Exchange Commission from selling securities.  Thus, as a consequence of his conviction, Eric Butler's livelihood has been destroyed permanently, and he will never reenter the profession that led to the present offense.  These circumstances, alone or combined with the other bases set forth above, establish that a non-Guidelines sentence is appropriate.

**V.**

**THE FACTORS SET FORTH IN 18 U.S.C. § 3553(A)
STRONGLY COUNSEL A LOW SENTENCE, WHICH
MAINTAINS MR. BUTLER'S FAMILY RELATIONSHIPS**

In fashioning an appropriate sentence, in addition to the Sentencing Guidelines, the Court must consider each of the factors set out in 18 U.S.C. § 3553(a).  Gall, 552 U.S. at 39.  The factors relevant under that section here include: (1) the background, history and individual characteristics of the defendant; (2) the nature and circumstances of the offense; (3) the need to protect the public from further crimes by the defendant; and (4) the need to provide adequate deterrence of others.  In taking these considerations into account – including Eric's strong ties to his family, lack of criminal background, history of living his life as an honest and reliable member of the community, lack of intent to cause any harm, sincere and reasonable belief that no harm could possibly come from his conduct, and the fact that Eric never again will be in the securities sales environment – the Court must arrive at a sentence that is "sufficient, but not greater than necessary, to comply with the purposes" of sentencing.  18 U.S.C. § 3553(a).  As set forth throughout this memorandum, a low sentence, which permits Eric to stay with his family, is appropriate here.

**A.**     **History and Characteristics of Eric Butler**[14]

Eric Butler's personal history and characteristics are universally positive and show a life centered upon his family and solid community connections.  He has no criminal history and, indeed, just the opposite.  His record is one of strong and successful efforts to be a good, respectful, and respected member of his family and his community.  The large volume of letters sent on Eric's behalf, many from people who have known Eric for most if not all of his life demonstrate this.

---

[14] 18 U.S.C. § 3553(a)(1).

B.      **Nature and Circumstances of the Offense**[15]

The nature and circumstances of the offense in this case present a number of unique sentencing considerations.  In this securities fraud case, the securities at issue were the highest rated in the country.  They traded in an auction market in which a security of that quality, AAA-rated, had a record of perfect liquidity.  The price paid for the securities represented their actual and fair value.  The interest rate was set at auction, and was uniformly believed to be fair.  The sales were made to professional investment advisors at large, international publically traded companies.  As the Court is aware, accurate account statements, including the official account statements, were sent repeatedly to the corporate investors, and were reviewed by them.  Eric Butler did not take or divert a penny of any investment for his personal use.  The sales were openly done through one of the largest investment banks in the world, Credit Suisse, which supervised and approved of the sale of the securities.  Credit Suisse believed, without any doubt, that the securities for which Eric Butler now faces a criminal sentence were safe, liquid, and completely suitable for the investors in this case.  The harm that befell investors – failed auctions, and the evaporation of a $300 billion United States financial market – was entirely unforeseeable.

Considered together the circumstances establish that the sentencing considerations here are unique: the man who stands before the Court for sentencing did not intend to hurt anybody, and did not foresee and could not reasonably have foreseen any harm from his conduct.

Cases in which the defendant did not intend to cause a loss are instructive here.  For example, in United States v. Miller, the defendant was convicted after trial of selling 84 fraudulent mortgages to 14 financial institutions over the course of 2½ years, and was sentenced to 1 year and 1 day incarceration.  588 F.2d at 562.  In that case, the calculated "gain" in

---

[15] 18 U.S.C. § 3553(a)(1).

commissions to the defendant was $355,191, and the face value of the loans purchased by the banks was $3,770,784.  The court in <u>Miller</u> first found that no "actual loss" had been proven, and that it was uncontested that the defendant did not intend that the banks lose any money, resulting in a loss calculation pursuant to the Guidelines of zero.  <u>Id</u>. at 567.  On appeal, the Eighth Circuit affirmed the sentence as substantively reasonable.  <u>Id</u>. at 568.

Similarly, the Seventh Circuit found that low sentences were appropriate for two defendants who were convicted of making false statements in order to obtain governmental contracts, but who intended to fulfill the contracts, and thus did not intend to cause any loss.  <u>See</u> <u>United States v. Schneider</u>, 930 F.2d 555, 559 (7th Cir. 1991).  In <u>Schneider</u>, the Court reversed sentences of 30 and 15 months incarceration for the two defendants as too high, and remanded the matter to the district court to impose a lower sentence that did not attribute loss to the defendants, because no loss had been proved, and because the defendants intended no loss.  <u>Id</u>. at 559.

The cases cited by the government in its "Caselaw on Securities Fraud Sentencing" (Gov. Mem. at pp. 18-22) are so dramatically different from the circumstances here that they highlight the singular nature of his case, and confirm that a low sentence is appropriate.  In fact, every case the government relies upon was one in which the defendant either intentionally set out to cause huge losses, or created such an obvious and grave risk of harm that great damage was certain. None of the cases cited by the government concern a defendant, like Eric Butler, who intended no harm, and could not foresee any harm.

For example, the government relies repeatedly on the well known case of Bernard Ebbers.  Gov. Mem. at pp. 19, 23 (citing <u>United States v. Ebbers</u>, 458 F.3d at 114).  Ebbers was the Chief Executive Officer of WorldCom, a global telecommunications company with 90,000

employees in 65 countries, and reported revenue of $39 billion in 2000.  458 F.3d at 114.  He led

a scheme to alter the books of his company for years in amounts totaling over $1 billion, such

that when the crime came to light, massive damages, caused directly by Ebbers actions, were a

certainty.  See id. at 114-117.

Ebbers is irrelevant.  Mr. Butler was a broker, who intended and could foresee no harm

arising from purchasing a AAA non-SL ARS versus a AAA SL ARS for a corporate investor.

Therefore, a case in which the head of a giant company directs a vast accounting fraud, which

was certain to cause massive losses to tens of thousands of investors, provides no guidance for

this case, in which a broker sold safe securities and intended no harm.

Similarly, the government cites United States v. Rigas, 583 F.3d 108 (2d Cir. 2009) to the

Court (Gov. Mem. at p. 20).   In that case, the defendants were the Chief Executive Officer

(CEO) of a large communications company, known as Adelphia, and his son, the Chief Financial

Officer (CFO).  There:

> [t]he evidence at trial showed that throughout the period of the
> conspiracy, Defendants took over $200 million dollars from
> Adelphia's Cash Management System for personal expenses
> ranging from $200 to purchase 100 pairs of bedroom slippers for
> Timothy Rigas, to over $3 million to produce a film by Ellen
> Rigas, to $200 million to pay off Rigas family margin loans. The
> missing money was obscured by the commingling of cash between
> Adelphia and [privately-held companies owned by the Rigases].

Id. at 121 (quoting United States v. Rigas, 490 F.3d 208, 218 (2d Cir. 2007)).  The defendants in

Rigas also altered the books of a publically held company they controlled to hide the massive

money diversions, and other unrecorded liabilities, in the amount of $2.2 billion; when the

enormous accounting fraud inevitably came to light, the defendants' actions directly caused the

bankruptcy of the company and enormous shareholder losses.  Id.

In <u>United States v. Adelson</u>, 441 F.Supp.2d 506 (S.D.N.Y. 2006), also cited by the government (Gov. Mem. at p. 19), the defendant was the Chief Operating Officer (COO) of a company specializing in cancer diagnosis testing.  <u>Id.</u> at 506.  An accounting fraud began in 2001 before the defendant's tenure as COO, and he continued the fraud in order to maintain the company's stock price at an artificially inflated level.  The court found that the defendant "would have reasonably foreseen when he joined the conspiracy that the eventual revelation of the overstatement of financial results would still likely cause at least at 20% further decline in the price of the stock," <u>id.</u> at 510, which inevitable loss totaled $59 million, and resulted in a 49-month sentence for the Chief Operating Officer of the company.  <u>Id.</u>

The government also cites the case <u>United States v. Parris</u>, 573 F.Supp.2d 744 (E.D.N.Y. 2008) (Gov. Mem. at p. 18), a classic "pump and dump" scheme in which the defendants made false statements to sell worthless stock.  After selling the worthless securities, the defendants in <u>Parris</u> used sham transactions through secretly controlled companies to hide the proceeds of the fraud, and secretly pocketed huge sums stolen directly from investors.  The court finding that "[t]his case represents another example where the guidelines in a securities-fraud prosecution 'have so run amok that they are patently absurd on their face'" sentenced the defendants to 5 years imprisonment, when the Guidelines in that case were calculated as 360-life.  <u>Id.</u> at 745.

None of these foregoing cases bear any resemblance to the facts presented here.  The government's citation of this "authority" demonstrated its failure to grasp the true nature of the events at issue.

The case that the government singles out to the Court as "remarkably similar to that presented here," <u>United States v. Soto-Cruz</u>, 449 F.3d 258 (1st Cir. 2006), actually is fundamentally dissimilar, and, if relevant at all, is only so to indicate that a low sentence is

appropriate here.  In Soto-Cruz, the defendant, who was sentenced to 12 years imprisonment, solicited investors to purchase what the Court characterized as "low-risk securities, including mortgage-backed securities issued by the Government National Mortgage Association," and the defendant accepted money from investors to purchase these securities.  Id. at 260.  The defendant in Soto-Cruz, however, bought nothing, but simply stole the investors' money by taking their checks, and depositing them into his personal accounts.  Securities and Exchange Commission v. Carlos Soto, et al., 04-1105 (D. Puerto Rico)(JP), at ¶¶ 9-17 (a copy of the Complaint in this action is attached to this Memorandum as Exhibit O).  The defendant then proceeded to use the stolen funds as he wished, some for personal expenses, some on his own investments, and some to use on a Ponzi scheme tactic of paying some "interest" to the investors.  Id. at ¶¶ 12-14.  Of course by stealing investors' money by putting it in his own bank account and spending it, the defendant in Soto-Cruz set out to intentionally cause a huge loss.

Soto-Cruz, therefore, presents conduct that, in the most basic way, is dissimilar to that of Mr. Butler.  The circumstances in Soto-Cruz of the defendant stealing millions of dollars in investors' money and putting it in his pocket causing an immediate intentional loss bears no resemblance to Mr. Butler's sales of AAA-rated ARS that he reasonably believed to be a completely investment product.  Soto-Cruz has no application in this matter, except to highlight that the nature of the offense counsels a low sentence.

Finally, the government quotes extensively from the comments of the Hon. I. Leo Glasser in United States v. Kumar (Gov. Mem. at pp. 21-22), yet the facts of that case are far different than those here.  Kumar was the President and Chief Operating Officer of Computer Associates, Inc., one of the largest software companies in the world, and he operated an accounting fraud that involved the senior officers of the company under his authority, including the General

Counsel, Chief Financial Officer, the head of Worldwide Sales, and others.  Gov. Mem. at Exh. D, p. 67.  Kumar also engaged in "the most brazen and comprehensive obstruction of justice" (id. at pp. 48, 68), and altered the books of the company to falsely indicate that earning targets had been met.  See id. at pp. 48, 69 64.  Kumar knew that by falsifying the business records of his company the chance of great harm to investors was extremely high when the fraud inevitably came to light.  See id. at pp. 48, 69 64.

This direct and intentional causing of harm by a CEO has no bearing on the appropriate sentence for a low-level broker selling securities over the telephone, making no policy or public statements, intending no loss and foreseeing no loss, in a case with no claim of obstruction of justice.  If relevant at all, the comparison of this case with that of Kumar establishes that a low sentence is appropriate here.

### C.    The Need to Protect the Public from Further Crimes by the Defendant[16]

There is no need to protect the public from further crimes of the defendant.  Eric Butler will never again sell securities.  His personal history, attested to by those who know him best, establishes that he is no risk to the public.  Accordingly, there is no need for an incarcertory sentence here to protect the public.  See, e.g., United States v. Diambrosio, Case No. 04-66, 2008 WL 732031, at * 3 (E.D. Pa. Mar. 13, 2008) (in sentencing a securities trader to a probationary sentence, the court held that there was no need to protect the public through an incarceratory sentence for reasons that included that the defendant had "lost his job" and was "forever barred form the securities industry").

---

[16] 18 U.S.C. § 3553(a)(2)(C).

**D.**   **The Need to Provide Adequate Deterrence of Others**[17]

Eric Butler has been completely devastated by this prosecution, personally, professionally, and financially.  The wide publicity generated in this case was both difficult for the defendant and his family and a strong deterrent to others involved in selling securities.

As found by the Court in <u>United States v. Adelson</u>, "there is considerable evidence that even relatively short sentences can have strong deterrent effect on prospective 'white collar' offenders."  441 F.Supp.2d at 514.  In this case, extensive publicity already has had a deterrent affect, and a low sentence, which by itself has "a strong deterrent effect," will appropriately effectuate the requirement of 18 U.S.C. § 3553e that the sentence here be "sufficient," but "not greater than necessary."

---

[17] 18 U.S.C. § 3553(a)(2)(B).

50

**VI.**

**THE GOVERNMENT'S FORFEITURE CLAIMS ARE INSUFFICIENT**

**A.     The Government May Only Seek Forfeiture**
**of Net Profits From Specific Illegal Transactions**

The Civil Asset Forfeiture Reform Act (CAFRA), codified at 18 U.S.C. § 981 et seq. and made applicable here by 28 U.S.C. § 2461(c), allows the Government to seek forfeiture of assets that constitute or are derived from "proceeds traceable to a violation" of one or more specified code sections. 18 U.S.C. § 981(a)(1)(C). Under the statute, the Government must "link assets to specific crimes of conviction." United States v. Capoccia, 503 F.3d 103, 116 (2d Cir. 2007). In other words, the Government must prove that particular funds constitute proceeds of "the specific violations of which [the defendant] was convicted" or constitute funds derived from those proceeds. Id. It is not enough for the Government to claim that assets have a connection to crimes. See United States v. Contents in Account No. 059-644190-69, 253 F.Supp.2d 789, 797 (D. Vt. 2003) (finding insufficient for forfeiture FBI agent's assertion that funds were linked to offenses); United States v. Wittig, 333 F.Supp.2d 1048, 1054 (D. Kan. 2004) (refusing to award advance payments of attorney's fees to defendant). The prosecution must prove that the assets are subject to forfeiture under the statute and, where it seeks money, calculate the amount. United States v. Morrison, Case No. 04-CR-699(DRH), 2009 WL 2929463, at *9 (E.D.N.Y. Sept. 10, 2009) (internal citation omitted) ("[T]he government bears the initial burden of proving, by a preponderance of the evidence, the amount forfeited.").

Title 18, United States Code, Section 981 utilizes different definitions of "proceeds" depending on the nature of the underlying offense. For cases involving "illegal goods, illegal services, unlawful activities, and telemarketing and health care fraud schemes," the term "proceeds" is defined as "property of any kind obtained directly or indirectly, as the result of the

51

commission of the offense giving rise to forfeiture, and any property traceable thereto, and is not limited to the net gain or profit realized from the offense."  18 U.S.C. § 981(a)(2)(A).  For cases involving "lawful goods or lawful services that are sold or provided in an illegal manner," by contrast, the term "proceeds" is limited to "the amount of money acquired through the illegal transactions resulting in the forfeiture, less the direct costs incurred in providing the goods or services" -- net profits from particular illegal sales or trades.  18 U.S.C. § 981(a)(2)(B).  This case is governed by Section 981(a)(2)(B), not 981(a)(2)(A).  The auction rate securities Mr. Butler sold were at most "lawful goods . . . provided in an illegal manner," not "illegal goods."  See United States v. Nacchio, 573 F.3d 1062, 1089 (10th Cir. 2009) (holding that securities are goods within the meaning of the statute).  There is no suggestion that the non-student loan ARS were contraband or otherwise illegal; to the contrary, they are precisely the sort of securities that Credit Suisse sold to its other institutional clients.  Therefore, Section 981(a)(2)(B), not Section 981(a)(2)(A), applies, and only the net profits of specific illegal transactions -- not all property directly or indirectly traceable to the offense -- is subject to forfeiture.

The Government assumes without explaining that Section 981(a)(2)(A) should apply in this case.  Sentencing Memorandum at 32.  By its terms, however, that provision applies to sales of "illegal goods," not "lawful goods or lawful services that are sold or provided in an illegal manner."   And although Section 981(a)(2)(A) also refers to "unlawful activities," that term cannot be construed so broadly as to cover sales of lawful goods in an illegal manner -- otherwise Section 981(a)(2)(B) would effectively be read out of the statute entirely.  See United States v. Kalish, Case No. 06 Cr. 656(RPP), 2009 WL 130215, at *8 (S.D.N.Y. Jan. 13, 2009) (holding that Sections 981(a)(2)(A) and 981(a)(2)(B) should be read together to give both sections meaning and applying subsection B in case involving an advance fee scheme); Nacchio,

573 F.3d at 1089 (citing <u>Kalish</u> and holding that insider trading scheme constituted purchase or sale of lawful goods in an illegal manner); <u>United States v. Santos</u>, -- U.S. --, 128 S. Ct. 2020 (2008) (in context of money laundering statute, holding that term "proceeds" was ambiguous, that rule of lenity should apply and that therefore "proceeds" referred to "profits," not "receipts").[18]

### B.  The Assets Sought By The Government Are Not Subject To Forfeiture Because They Do Not Constitute Or Derive From Net Profits From Specific Illegal Transactions

The Government seeks forfeiture of two amounts:  the $4.45 million forgivable loan that Mr. Butler received as part of his employment with Morgan Stanley,[19] and $320,948 in commissions that he received while at Credit Suisse.  Neither amount is subject to forfeiture under the applicable standards set forth above.

The Morgan Stanley loan does not in any sense represent net profits of particular unlawful transactions, or other assets derived from such proceeds.  Although the government asserts that Mr. Butler would not have received the loan "[b]ut for his participation in the fraud scheme and the materially false and misleading information the defendant provided to his client investors" (Gov. Mem. at p. 37), that simply is not sufficient for purposes of forfeiture under Section 981(a)(2)(B).  That provision requires the government to prove that the assets constitute or derive from net profits of particular transactions, not merely that they are directly or indirectly

---

[18] The Government cites two cases for its contrary reading of the statute -- <u>United States v. Lizza Industries</u>, 775 F.2d 492 (2d Cir. 1985) and <u>United States v. Kelley</u>, Case No. 06-5536-cr, 2009 WL 19083 (2d Cir. Jan. 5, 2009). Neither is relevant.  <u>Lizza Industries</u> addresses the interpretation of the RICO forfeiture statute, a different law with a differently worded forfeiture provision, and <u>Kelley</u> contains only a citation to Section 981(a)(2)(A) without analysis.  In <u>Kalish</u>, the Southern District considered whether <u>Kelley</u> was controlling or even persuasive on whether certain crimes constitute "illegal services [or] unlawful activities" under Section 981(a)(2)(A) or "lawful services that are … provided in an illegal manner" under Section 981(a)(2)(B), and found that it was not.  <u>Kalish</u>, 2009 WL 1437798 at *1 (denying Motion for Reconsideration of Jan. 13, 2009 decision).  As the court noted, there is no indication in <u>Kelley</u> that the manner of calculating proceeds was even at issue in that case.  <u>Id</u>.

[19] While the Government refers to the Morgan Stanley payment as a "bonus," it was a forgivable loan.  Morgan Stanley currently is seeking repayment of the loan in a separate arbitration proceeding.

traceable to the *offense*.  Even if Section 981(a)(2)(A) rather than Section 981(a)(2)(B) applied, moreover, the connection between the charged offenses and the Morgan Stanley loan is simply too attenuated to support a forfeiture claim.  As explained above in Section IV.D.3.b., <u>supra</u>, the Morgan Stanley loan was based on all of Mr. Butler's production at Credit Suisse, only a portion of which was the accused ARS sales; and the loan bears only a remote and speculative connection to the charged offenses in any event.  Consequently, forfeiture of the loan is inappropriate under any standard.

Nor is the government entitled to forfeiture of the $320,948 in commissions that Mr. Butler earned while at Credit Suisse.  As explained above Section IV.D.3.a., <u>supra</u>, that figure is substantially inflated because, among other things, it includes commissions on student loan ARS as well as securities that are not ARS at all, neither of which represent net proceeds of any specific unlawful transaction.  By lumping authorized and unauthorized transactions together, the Government has failed to meet its burden of calculating and proving the actual gain to Mr. Butler from illegal purchases.  <u>See</u> <u>Morrison</u>, 2009 WL 2929463 at *9.

## VII.

## <u>RESTITUTION MAY NOT BE AWARDED IN THIS CASE</u>

In its Sentencing Memorandum, the Government claims that investors are entitled to more than <u>$1 billion</u> in restitution from Mr. Butler.  Gov. Mem. at pp. 40-41.  The statute on which the Government relies simply does not permit such an award.  Under 18 U.S.C. § 3663A, restitution is appropriate only where persons have been "directly and proximately harmed" by the commission of a crime.[20]  It is not enough that persons were injured or sustained losses as a result of an offense.  Rather, the Government must show that those injuries were a "direct and foreseeable" consequence of the illegal conduct.  <u>United States v. Donaghy</u>, 570 F.Supp.2d 411, 432 (E.D.N.Y. 2008); <u>see</u> <u>also</u> <u>United States v. Donaby</u>, 349 F.3d 1046, 1054 (7th Cir. 2003) (addressing whether losses were "likely and foreseeable outcome of the crime").  As explained in Section II.C., <u>supra</u>, the failure of the auctions was an unforeseen event for brokers, and Mr. Butler had no way to anticipate the ARS market would cease to exist.  His actions plainly were not the proximate cause of losses to investors.

Moreover, even if Mr. Butler's conduct had directly and proximately caused the losses in this case, the Government has failed to offer a plausible estimate of what those losses might be.  For restitution, the Government bears the burden of proving the actual amount.  <u>United States v. Masek</u>, -- F.3d --, Case No. 08-1296, 2009 WL 4680328, at *3 (10th Cir. Dec. 10, 2009) ("The government bears the burden of proving the amount of loss by a preponderance of the evidence."); <u>United States v. Innarelli</u> 524 F.3d 286, 293 (1st Cir. 2008) (holding same).  As detailed in Section IV.C.2., <u>supra</u>, the Government has made no effort to calculate the value of the securities at issue in this case or to put forward a reasonable loss figure.

---

[20]  U.S.S.G. § 5E1.1 also requires Courts to enter restitution orders but only "if such order is authorized under" 18 U.S.C. § 3663A or another enumerated statute.

## VIII.

## CONSIDERATION OF A FINE

The burden that a fine could place upon the defendants of Mr. Butler is of central consideration here.  See Guideline § 5E1.2.  Therefore, it is respectfully requested that any fine imposed by the Court take into account the needs of Mr. Butler's family.

While the Presentence Report states that the maximum fine here is over $2 Billion, or twice the purported "loss," this calculation is based upon a wholly faulty analysis of the claimed loss in this case.   As discussed above at pages 26 through 30, the loss here was zero, and the appropriate Guideline range is 11.  According to the advisory Guidelines, this level carries a fine range of between $2,000 and $20,000.  This range is appropriate, as it reflects that Mr. Butler did not intend or foresee any loss from the conduct at issue in this case.

## **CONCLUSION**

For the reasons stated in this Sentencing Memorandum, it is respectfully requested that

Mr. Butler, who intended no loss to any company or person, and to whom it was unforeseeable

that any loss could occur, be allowed to remain with his family.

Dated: January 7, 2010
       New York, New York

_____/s/_____
EMMET, MARVIN & MARTIN, LLP
Paul T. Weinstein
*Attorneys for Defendant Eric Butler*
120 Broadway, 32nd Floor
New York, New York  10271
(212) 238-3000


_____/s/_____
MOLO LAMKEN LLP
Steven F. Molo
Robert K. Kry
Edward F. Daniels
*Attorneys for Defendant Eric Butler*
350 Park Avenue
New York, NY 10022
(212) 607-8160
